## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON

FELMAN PRODUCTION, INC.,
a Delaware corporation,

Plaintiff,

3:09-cv-0481

vs.                                        CIVIL ACTION NO. 09-C-_____

INDUSTRIAL RISK INSURERS,
an unincorporated association,

WESTPORT INSURANCE COMPANY,
a Missouri corporation, and

SWISS REINSURANCE AMERICA
CORPORATION , a New York corporation,

Defendants.

## COMPLAINT

Plaintiff, Felman Production, Inc., (hereinafter "Felman"), brings this Complaint against Industrial Risk Insurers (hereinafter "IRI") Westport Insurance Company (hereinafter "Westport") and Swiss Reinsurance America Corporation (hereinafter "Swiss Re") (IRI, Westport and Swiss Re collectively referred to as the "Insurers") for declaratory relief pursuant to 28 U.S.C. § 2201, *et seq.*, for breach of an insurance contract between Felman and the Insurers, and for damages arising from the Insurers' bad faith failure and/or refusal to discharge their responsibilities under Felman's insurance policy, and states:

### PARTIES

1.     Felman is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Mason County, West Virginia, within the Southern District of West Virginia.

2. IRI is an unincorporated association, with its principal place of business in Connecticut.

3. Westport is a corporation organized and existing under the laws of the State of Missouri, with its principal place of business in Kansas. Westport is one of two members of IRI.

4. Swiss Re is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York. Swiss Re is the second of two members of IRI.

## JURISDICTION AND VENUE

5. This Court has personal jurisdiction over the Insurers, because the Insurers conduct systematic and continuous business in the State of West Virginia, including, but not limited to, the issuance of the subject insurance policy to Felman in West Virginia insuring risks of damage to property and to business operations located in West Virginia.

6. The amount in controversy in this case exceeds the sum of $75,000.00, exclusive of interest and costs.

7. The Court has jurisdiction of this action based upon 28 U.S.C. § 2201, there being an actual controversy between the parties, and upon 28 U.S.C. §1332(a)(1), there being complete diversity of citizenship between Felman and the Insurers, and the requisite amount in controversy.

8. Venue properly lies within this Court pursuant to 28 U.S.C. §1391.

## FACTUAL BACKGROUND

9. Felman owns and operates a metals plant (the "Plant") located in New Haven, Mason County, West Virginia, with 219 employees. Felman produces silicon-manganese at its New Haven Plant for resale to steelmakers throughout the country. The steelmakers incorporate

2

silicon-manganese into steel in order to increase its strength and flexibility, and to otherwise improve the overall performance of the steel.

10.     Felman's Plant houses three separate furnaces which are each independently capable of producing silicon-manganese by smelting the necessary ingredients.  These furnaces are designated Furnace #2, Furnace #5 and Furnace #7.

**A.     The Policy.**

11.     Felman purchased a commercial Property Insurance Policy issued by the Insurers, identified as Policy Number 31-3-72004, effective February 23, 2008 to February 23, 2009 (hereinafter "the Policy").  The Policy provides coverage for property damage and business interruption loss in connection with, *inter alia*, Felman's Plant operations.  Felman paid a substantial premium of $194,150, plus $10,068 in fees, for the Policy.

12.     The Policy obligates the Insurers to pay for physical loss and damage to covered property while on the Described Premises.  A true and correct copy of the Policy is attached as Exhibit A.

13.     All real property in which Felman has an insurable interest, and which is identified in the Schedule of Locations on file with the members of Defendant IRI, is covered property.  Exhibit A.

14.     The term "Described Premises" is defined as including "locations described on a Schedule of Locations on file with the Companies and within the Policy Territory."  The Policy declarations state that the term "Schedule of Locations on file with the Companies" means "all locations within the Policy Territory as described in a Schedule of Locations on file with the Companies as of January 4th, 2008."  The term "Companies" is defined as the members of Defendant IRI.  The "Policy Territory" includes the entire United States of America.  Exhibit A.

15. The Policy also obligates the Insurers to pay Felman for loss that Felman sustains resulting directly from the necessary interruption of business caused by physical loss or damage of the type insured against under the Policy, to real property of the type covered under the Policy, when that property is located on Described Premises. Exhibit A.

**B.     The Loss.**

16. On or about April 27, 2008, a transformer that supplied power to Furnace #2 failed and sustained physical damage which rendered the Furnace inoperable (the "Failure"). At the time of the Failure and damage, the Furnace and transformer were located in Felman's Plant as permanent parts of the Plant. Felman's Plant is at a location in West Virginia that is identified in the Schedule of Locations on file with the members of IRI as of January 4, 2008, that is within the Policy Territory, and that is part of the Described Premises.

**C.     The Insurers' Delay In Responding To Felman's Proof of Loss.**

17. Felman provided notice of the Failure to the Insurers approximately one year ago, by a letter dated May 9, 2008. Soon thereafter, the Insurers began continuous and ever-expanding requests for extraordinary amounts of information and documents. During the past year, Felman has provided the insurers with hundreds of documents, has participated in two face to face meetings with the Insurers and their representatives, has regularly responded to numerous additional requests for specific information, and has made the transformer and Furnace available for inspection. Now, after Felman has spent a full year investing substantial resources in responding to the Insurers' requests, there is no end to the requests in sight, the Insurers have still not accepted or rejected Felman's claim, and the Insurers have refused either to recognize the inapplicability of a provision requiring the filing of suit within one year following the loss or to

agree to a tolling agreement related to the provision that does not grant the Insurers additional rights that they are not otherwise entitled to.

18.     Felman provided documents and information during the summer of 2008, and the Insurers' expert inspected the failed Furnace #2 transformer on July 14, 2008, more than nine months ago.

19.     Felman submitted its proof of loss to the Insurers more than eight months ago, on or about August 22, 2008.  By its proof of loss, Felman notified the Insurers that repairs to the Furnace #2 transformer were to be performed by a third party vendor, and were expected to take eight months to complete (from April, 2008 to December, 2008), at a cost exceeding $1.2 million.  Felman further notified the Insurers that it anticipated more than $38 million in business interruption loss during the eight month repair period.  Felman estimated that its total covered loss would exceed $39 million.

20.     Section 114-14-6.7 of the West Virginia Code of State Rules establishes a standard for prompt investigations and fair and equitable settlements, applicable to all insurers. This Rule states that if an insurer needs more than thirty calendar days from the date that a proof of loss is received from a first-party claimant in order to determine whether the claim should be accepted or denied, the insurer must notify the claimant in writing within fifteen working days after the thirty-day period expires.  W.Va. C.S.R. § 114-14-6.7.  The section further provides that if the investigation remains incomplete, the insurer shall provide written notification of the delay to the claimant every forty-five calendar days thereafter until the investigation is complete.  *Id.* All such notifications must set forth the reasons additional time is needed.  *Id.*  On September 4, 2008, Felman entered into an agreement tolling the original thirty day time period for the

Insurers to respond to Felman's proof of loss, so that the Insurers would have additional time to gather and assess information concerning Felman's claim.

21.    Five days later, on September 9, 2008, Felman's Chief Executive Officer, Steven Pragnell, and its Chief Financial Officer, Sergiy Protashchuk, met with the Insurers' independent claims adjuster, the Insurers' accounting expert and a representative from IRI.  Mr. Pragnell and Mr. Protashchuk answered all questions posed by the Insurers and their representatives.  The Insurers did not reference the need for any examinations under oath.

22.    On or about October 6, 2008, the date that the Insurers' first forty-five day notice would have been due, the Insurers requested an additional extension of the time to respond to Felman's proof of loss, which Felman granted.  By an October 6 e-mail, the Insurers demanded even more documents, but never requested an examination under oath.  That same week, the Insurers followed-up with a second e-mail stating that the Insurers were still not in a position to accept or reject Felman's proof of loss. Felman agreed to extend the tolling agreement for more than three additional months, to January 31, 2009, so that the Insurers would have additional time to continue to evaluate Felman's claim.  At no time during this extension did the Insurers request any examination under oath.

23.    By an e-mail of January 8, 2009, the Insurers' accounting expert informed Mr. Protashchuk that it was "imperative" that he agree to meet for a second day, and then make himself available for follow-up questions on the following day.  On January 13, 2009, Mr. Pragnell and Mr. Protashchuk again met with the Insurers for a second full day, and provided the Insurers with even more details regarding the basis for Felman's claim.  Mr. Pragnell and Mr. Protashchuk then provided a significant amount of additional information to the Insurers' consultant during meetings the following day.

24.    More than three weeks later, on January 31, 2009, the tolling agreement expired by its own terms, and the Insurers still had not accepted or rejected Felman's proof of loss. True to form, however, the Insurers requested additional information on the 31st, and Felman provided answers the same day. Two months later, by a letter dated March 23, 2009, the Insurers completely reversed course and denied that any tolling agreement was even required, despite the fact that they had previously obtained extensions of the agreement from Felman on two separate occasions.

25.    On February 19, 2009, almost ten months after the Failure, almost six months after Felman submitted its proof of loss, after having previously met with Mr. Pragnell and Mr. Protashchuk for three days, after inspecting the Furnace and transformer, and after exchanging numerous additional e-mails and communications with Mr. Protashchuk and Mr. Pragnell, the Insurers requested for the first time the opportunity to examine Mr. Pragnell and Mr. Protashchuk under oath. The Insurers also requested the examinations of three additional Felman employees whose testimony is likely to be redundant, irrelevant and unlikely to lead to the resolution of any dispute pertaining to the existence of insurance coverage.

26.    In addition, and despite having already received numerous documents from Felman, the Insurers made additional requests for information and documents in their February 19 letter, and further requested that the information and documents be provided by March 6, 2009 – just over two weeks later. Felman diligently prepared responses to these new requests, and other requests from the Insurers pending at that time, and provided the Insurers with the additional information, and a DVD full of documents, in March, 2009.

27.    Felman made a reasonable request that the Insurers identify the issues that they intended to explore during the examinations under oath, so that Felman could identify

appropriate representatives and make them available. The Insurers brushed off the request, and responded with a list of general bullet points that did not in any way provide Felman guidance regarding the specific issues that the Insurers intended to address or to permit Felman to identify appropriate witnesses to address those issues.

28.    In the Fall of 2008, the Insurers requested that they be permitted access to Furnace #2 when the transformer had been repaired, reinstalled and the Furnace was returned to operation. The Furnace #2 transformer was repaired by the third party vendor, at a cost of more than $1.2 million, and returned to Felman on January 12, 2009. The Furnace has been in operation since January 21, 2009. Although Felman has informed the Insurers on multiple occasions that they may arrange for a time to visit Felman's Plant, inspect the Furnace and transformer and evaluate their performance, the Insurers have not conducted any physical inspection of the Furnace #2 transformer since it was reinstalled more than three months ago, in January, 2009.

29.    A smelting furnace, such as Furnace #2, cannot immediately be returned to full capacity after sitting idle for months. Furnace #2 was inoperable from April 27, 2008 to January, 2009. Furnace #2 was thus run in a warm-up and evaluation mode until the end of March, 2009, when the Furnace was then returned to full capacity.

30.    As noted above, the Insurers twice took the position that they needed a tolling agreement extending their time to respond to Felman's proof of loss. Felman agreed on both occasions, with no strings attached. Because Felman had twice granted the Insurers a tolling agreement, and because the Insurers have never accepted or rejected Felman's proof of loss, in the weeks prior to the filing of this lawsuit, Felman requested that the Insurers enter into an agreement to toll the Policy's "Suit" provision, which purports to require that Felman file suit for

recovery under the Policy within twelve months after inception of the loss. Felman believes that the Suit provision is not applicable at this time and cannot be relied upon by the Insurers to deny coverage. The Insurers have refused to recognize the inapplicability of the provision. Felman, based on the lack of a substantive response to its proof of loss, requested an extension of this filing deadline so that the parties could explore a voluntary resolution of this matter, and so that Felman could respond to the Insurers' requests for examinations under oath.

31. In response, the Insurers completely ignored the fact that the proposed extension was necessitated solely by their own excessive and unexplained delay in evaluating Felman's claim, and their recent requests for examinations under oath. The Insurers rejected Felman's proposed draft agreement and refused to toll the time period for filing suit, as set forth in the Suit provision, unless Felman agreed to grant the Insurers additional rights to which they were not otherwise entitled. Felman could not accept the Insurers' unreasonable demands, and therefore Felman was left with no reasonable option but to file the instant lawsuit so as to comply with the Suit provision, as extended by agreement of the parties through May 1, 2009. The Insurers sought to use their delay in addressing Felman's claim, their recent requests for examinations under oath, and their refusal to acknowledge the inapplicability of the Suit provision to extract from Felman rights to which they were not entitled.

32. Felman paid in excess of $1.2 million for repair of the Furnace #2 transformer.

33. From April 27, 2008 through the end of March, 2009, Felman suffered business income interruption loss in excess of $39 million.

34. The Insurers did not accept or deny Felman's claim within thirty days of receipt of Felman's proof of loss. This thirty day period expired on September 21, 2008. The Insurers have not provided Felman with notices that their investigation of Felman's claim remains

incomplete, setting forth the reasons they claim additional time is needed for investigation, at the expiration of every forty five day period after October 6, 2008.

35.    The Insurers have not promptly conducted and diligently pursued a thorough, fair and objective investigation.    Rather, the Insurers have unreasonably delayed resolution of Felman's claim by persisting in seeking information not reasonably required for or material to the resolution of a claim dispute.

**COUNT I**
**DECLARATORY JUDGMENT**

36.    The allegations set forth in paragraphs 1 through 35 are incorporated herein by reference.

37.    The Policy obligates the Insurers to pay for physical loss and damage to covered property while on the Described Premises.    The Failure caused direct physical damage to the Furnace #2 transformer.    The Furnace #2 transformer is covered property under the Policy, and was damaged when it was located on the Described Premises.    Thus, the direct physical loss and damage to the Furnace #2 transformer falls within the scope of the insuring agreement in the Policy.

38.    The Policy also obligates the Insurers to pay for loss resulting directly from the necessary interruption of business when that interruption is caused by physical damage of the type insured against under the Policy, to real property which is the type covered under the Policy and is located on Described Premises.    The direct physical damage to the Furnace #2 transformer is covered under the Policy, and caused Felman to sustain loss resulting directly from the necessary interruption of its business.    Thus, the business interruption loss that Felman sustained falls within the scope of the insuring agreement in the Policy.

39.    The Insurers are contractually obligated to pay for the damage to the Furnace #2 transformer caused by and resulting from the Failure, as well as the business interruption loss that Felman has sustained, up to and including the $25 million Policy limits.

40.    The Insurers have made a payment of $5 million to Felman, but in violation of their obligations under West Virginia Code § 33-11-4(9)(j), the Insurers have not identified the policy provision under which the payment was made. In breach of their contractual obligation, the Insurers have failed and/or refused, and continue to refuse, to pay for the complete damage to the Furnace #2 transformer caused by and resulting from the Failure, and have further failed and/or refused, and continue to refuse, to pay for the complete business interruption loss resulting from the damage to the Furnace #2 transformer. Indeed, the Insurers have refused to state their coverage position.

41.    The Insurers have not identified any Policy provision which excuses their failure to provide complete coverage for Felman's property damage or business interruption loss. The Insurers have not identified any facts or bases upon which the Insurers may avoid providing complete coverage for Felman's insurance claim.

42.    The Insurers' refusal to provide complete coverage is without foundation, and is unreasonable.

43.    An actual and immediate controversy exists between Felman and the Insurers with respect to the Insurers' duties and obligations under the Policy in that Felman contends, and the Insurers deny, that the Insurers are obligated to pay for the complete damage to the Furnace #2 transformer caused by and resulting from the Failure, and that the Insurers are obligated to pay for the complete business interruption loss that Felman sustained as a direct result of that damage, up to and including the $25 million Policy limits.

44.   There presently exists a bona fide, actual controversy between the parties.  This dispute concerns more than $75,000 in insurance coverage, exclusive of interest and costs.  The requested declaration further deals with a present, ascertained or ascertainable state of facts or present controversy as to a state of facts.  Accordingly, pursuant to 28 U.S.C. § 2201, Felman asks this Court to declare the rights of the parties.

45.   Felman is in full compliance with all of the terms and conditions of the Policy, or is excused from complying with such conditions because of the Insurers' refusal to enter into a tolling agreement in good faith.

WHEREFORE, Felman respectfully requests that this Court declare that the Insurers are obligated to pay for the complete damage to the Furnace #2 transformer caused by and resulting from the Failure and that the Insurers are obligated to pay for the business interruption loss that Felman has sustained as a result of that damage, up to and including the $25 million Policy limits, and that the Insurers are obligated to reimburse Felman for all amounts that Felman has incurred to obtain the declaration sought herein, and that the Insurers are obligated to reimburse Felman for its costs and such further necessary or proper relief based on the declaratory judgment or decree as this Court may deem appropriate.

## COUNT II
## BREACH OF CONTRACT

46.   The allegations set forth in paragraphs 1 through 45 are incorporated herein by reference.

47.   The Policy obligates the Insurers to pay for physical loss and damage to covered property while on the Described Premises.  The Failure caused direct physical damage to the Furnace #2 transformer.  The Furnace #2 transformer is covered property under the Policy, and was damaged when it was located on the Described Premises.  Thus, the direct physical loss and

damage to the Furnace #2 transformer falls within the scope of the insuring agreement in the Policy.

48.    The Policy also obligates the Insurers to pay for loss resulting directly from the necessary interruption of business when that interruption is caused by physical damage of the type insured against under the Policy, to real property which is the type covered under the Policy and is located on Described Premises.  The direct physical damage to the Furnace #2 transformer is covered under the Policy, and caused Felman to sustain loss resulting directly from the necessary interruption of its business.  Thus, the business interruption loss that Felman sustained falls within the scope of the insuring agreement in the Policy.

49.    The Insurers are contractually obligated to pay for the damage to the Furnace #2 transformer caused by and resulting from the Failure, as well as the business interruption loss that Felman has sustained, up to and including the $25 million Policy limits.

50.    The Insurers have made a payment of $5 million to Felman, but in violation of their obligations under West Virginia Code § 33-11-4(9)(j), the Insurers have not identified the policy provision under which the payment was made.  In breach of their contractual obligation, the Insurers have failed and/or refused, and continue to refuse, to pay for the complete damage to the Furnace #2 transformer caused by and resulting from the Failure, and have further failed and/or refused, and continue to refuse, to pay for the complete business interruption loss resulting from the damage to the Furnace #2 transformer.  Indeed, the Insurers have refused to state their coverage position.

51.    The Insurers have not identified any Policy provision which excuses their failure to provide complete coverage for Felman's property damage or business interruption loss.  The

Insurers have not identified any facts or bases upon which the Insurers may avoid providing complete coverage for Felman's insurance claim.

52. The Insurers' refusal to provide complete coverage is without foundation, and is unreasonable.

53. As a direct and proximate result of the Insurers' breach of their contractual obligations, Felman has sustained damages in the form of the costs and expenses it has incurred arising from the damage to the Furnace #2 transformer caused by and resulting from the Failure, as well as the costs and expenses Felman has incurred arising from the Insurers' refusal to pay for the complete business interruption loss that Felman has sustained as a result of the Failure. The Insurers are liable to Felman for the costs and expenses Felman has incurred to date, and for any amount yet to be incurred, but which will be incurred because of the Insurers' continued failure to honor their contractual obligations, which amounts exceed $75,000, exclusive of interest and costs.

54. Felman is in full compliance with all of the terms and conditions of the Policy, or is excused from complying with such conditions because of the Insurers' refusal to enter into a tolling agreement in good faith.

WHEREFORE, Felman respectfully requests that this Court enter judgment in its favor for all damages that Felman has sustained or will sustain as a consequence of the Insurers' failure to honor their obligations under the Policy, including attorney's fees, costs and such further necessary or proper relief as this Court may deem appropriate.

## COUNT III
## BAD FAITH

55. The allegations set forth in paragraphs 1 through 54 are incorporated herein by reference.

56.    The Policy obligates the Insurers to pay for all physical loss and damage to covered property while on the Described Premises. The Failure caused direct physical damage to the Furnace #2 transformer. The Furnace #2 transformer is covered property under the Policy, and was damaged when it was located on the Described Premises. Thus, the direct physical loss and damage to the Furnace #2 transformer falls within the scope of the insuring agreement in the Policy.

57.    The Policy also obligates the Insurers to pay for loss resulting directly from the necessary interruption of business when that interruption is caused by physical damage of the type insured against under the Policy, to real property which is the type covered under the Policy and is located on Described Premises. The physical damage to the Furnace #2 transformer is covered under the Policy, and caused Felman to sustain loss resulting directly from the necessary interruption of its business. Thus, the business interruption loss that Felman sustained falls within the scope of the insuring agreement in the Policy.

58.    The Insurers are contractually obligated to pay for the damage to the Furnace #2 transformer caused by and resulting from the Failure, as well as the business interruption loss that Felman has sustained, up to and including the $25 million Policy limits.

59.    The Insurers have made a payment of $5 million to Felman, but in violation of their obligations under West Virginia Code § 33-11-4(9)(j), the Insurers have not identified the policy provision under which the payment was made. In breach of their contractual obligation, the Insurers have failed and/or refused, and continue to refuse, to pay for the complete damage to the Furnace #2 transformer caused by and resulting from the Failure, and have further failed and/or refused, and continue to refuse, to pay for the complete business interruption loss

resulting from the damage to the Furnace #2 transformer. Indeed, the Insurers have refused to state their coverage position.

60. The Insurers have not identified any Policy provision which excuses their failure to provide complete coverage for Felman's property damage or business interruption loss. The Insurers have not identified any facts or bases upon which the Insurers may avoid providing complete coverage for Felman's insurance claim.

61. The Insurers' refusal to provide complete coverage is without foundation, and is unreasonable.

62. As a direct and proximate result of the Insurers' breach of their contractual obligations, Felman has sustained damages in the form of the costs and expenses it has incurred arising from the damage to the Furnace #2 transformer caused by and resulting from the Failure, as well as the costs and expenses Felman has incurred arising from the Insurers' refusal to pay for the complete business interruption loss that Felman has sustained as a result of the Failure. The Insurers are liable to Felman for the costs and expenses Felman has incurred to date, and for any amount yet to be incurred, but which will be incurred because of the Insurers' continued failure to honor their contractual obligations, which amounts exceed $75,000, exclusive of interest and costs.

63. The Insurers have a legal duty to deal with Felman, their insured, fairly and in good faith. The Insurers have acted in bad faith in failing to discharge their contractual responsibilities under the Policy, and in their handling of Felman's claim. The Insurers have caused unnecessary delay and refused to completely pay Felman's claim without proper cause.

64. The Insurers' bad faith actions have caused Felman to sustain damages, in an amount exceeding $75,000, excluding interest and costs, including damages in the form of the

16

costs and expenses Felman has incurred arising from the damage to the Furnace #2 transformer, the business interruption loss that Felman has sustained, Felman's loss arising from the Insurers' delay, damages for Felman's inconvenience and aggravation, and the attorney's fees Felman incurred in vindicating its claim. The Insurers are liable to Felman for Felman's damages arising from the Insurers' continued bad faith actions, and for any amount yet to be incurred, but which will be incurred because of the Insurers' continued bad faith acts, which amount exceeds $75,000, exclusive of interest and costs.

65. Felman is in full compliance with all of the terms and conditions of the Policy, or is excused from complying with such conditions because of the Insurers' refusal to enter into a tolling agreement in good faith.

66. The Insurers' bad faith conduct has necessitated Felman's hiring of counsel in order to recover the full amount of the Policy proceeds.

WHEREFORE, Felman respectfully requests that this Court enter judgment in its favor for all damages that Felman sustains as a consequence of the Insurers' bad faith acts, including but not limited to amounts that Felman has incurred to obtain a declaration that the Insurers are obligated to pay for damage to the Furnace #2 transformer and for the business interruption loss, as well as the amounts of Felman's loss arising from the Insurers' delay, damages for Felman's inconvenience and aggravation, and the attorney's fees Felman incurred in vindicating its claim, and that this Court further order that the Insurers are obligated to reimburse Felman for its costs and such further necessary or proper relief based on the declaratory judgment or decree as this Court may deem appropriate.

## COUNT IV
## VIOLATION OF WEST VIRGINIA UNFAIR TRADE PRACTICES ACT

67.    The allegations set forth in paragraphs 1 through 66 are incorporated herein by reference.

68.    The Policy obligates the Insurers to pay for all physical loss and damage to covered property while on the Described Premises.  The Failure caused direct physical damage to the Furnace #2 transformer.  The Furnace #2 transformer is covered property under the Policy, and was damaged when it was located on the Described Premises.  Thus, the direct physical loss and damage to the Furnace #2 transformer falls within the scope of the insuring agreement in the Policy.

69.    The Policy also obligates the Insurers to pay for loss resulting directly from the necessary interruption of business when that interruption is caused by physical damage of the type insured against under the Policy, to real property which is the type covered under the Policy and is located on Described Premises.  The direct physical damage to the Furnace #2 transformer is covered under the Policy, and caused Felman to sustain loss resulting directly from the necessary interruption of its business.  Thus, the business interruption loss that Felman sustained falls within the scope of the insuring agreement in the Policy.

70.    The Insurers are contractually obligated to pay for the damage to the Furnace #2 transformer caused by and resulting from the Failure, as well as the business interruption loss that Felman has sustained, up to and including the $25 million Policy limits.

71.    The Insurers have made a payment of $5 million to Felman, but in violation of their obligations under West Virginia Code § 33-11-4(9)(j), the Insurers have not identified the policy provision under which the payment was made.  In breach of their contractual obligation, the Insurers have failed and/or refused, and continue to refuse, to pay for the complete damage to

18

the Furnace #2 transformer caused by and resulting from the Failure, and have further failed and/or refused, and continue to refuse, to pay for the complete business interruption loss resulting from the damage to the Furnace #2 transformer. Indeed, the Insurers have refused to state their coverage position.

72. The Insurers have not identified any Policy provision which excuses their failure to provide complete coverage for Felman's property damage or business interruption loss. The Insurers have not identified any facts or bases upon which the Insurers may avoid providing complete coverage for Felman's insurance claim.

73. The Insurers' refusal to provide complete coverage is without foundation, and is unreasonable.

74. As a direct and proximate result of the Insurers' breach of their contractual obligations, Felman has sustained damages in the form of the costs and expenses it has incurred arising from the damage to the Furnace #2 transformer caused by and resulting from the Failure, as well as the costs and expenses Felman has incurred arising from the Insurers' refusal to pay for the complete business interruption loss that Felman has sustained as a result of the Failure. The Insurers are liable to Felman for the costs and expenses Felman has incurred to date, and for any amount yet to be incurred, but which will be incurred because of the Insurers' continued failure to honor their contractual obligations, which amounts exceed $75,000, exclusive of interest and costs.

75. The Insurers have acted in bad faith in failing to discharge their contractual responsibilities under the Policy. The Insurers have caused unnecessary delay and refused to completely pay Felman's claim without proper cause.

76.    The Insurers have violated Section 33-11-4(9)(b) of the West Virginia Unfair Trade Practices Act ("Act") by failing to act reasonably promptly upon communications from Felman with respect to claims arising under the Policy.

77.    The Insurers have committed a separate and discrete violation of Section 33-11-4(9)(d) of the Act by refusing to pay Felman's claim after failing to conduct a reasonable investigation based on all available information.

78.    The Insurers have committed a separate and discrete violation of Section 33-11-4(9)(e) the Act by failing to affirm or deny coverage for Felman's claim within a reasonable time after the Insurers received proof of loss statements from Felman.

79.    The Insurers have committed a separate and discrete violation of Section 33-11-4(9)(j) of the Act by making a claims payment to Felman that was not accompanied by a statement setting forth the coverage under which the payment was being made.

80.    The Insurers have committed a separate and discrete violation of Section 33-11-4(9)(m) the Act by failing to promptly settle Felman's claim for property damage, for which liability is reasonably clear, in an attempt to influence a decreased settlement under the Policy's business interruption coverage.

81.    The Insurers have committed a separate and discrete violations of Section 114-14-6.1 of the West Virginia Code of State Rules by failing to promptly conduct and diligently pursue a thorough, fair and objective investigation of Felman's claim, and by unreasonably delaying resolution by persisting in seeking information not reasonably required for or material to the resolution of a claim dispute.

82.    The Insurers have committed a separate and discrete violation of Section 114-14-6.7 of the West Virginia Code of State Rules by failing to provide Felman written notification of

the reasons for their delay in investigating Felman's claim at the expiration of every forty-five calendar day period described in the Rule.

83.    Felman is in full compliance with all of the terms and conditions of the Policy, or is excused from complying with such conditions because of the Insurers' refusal to enter into a tolling agreement in good faith.

84.    The Insurers' bad faith conduct has necessitated Felman's hiring of counsel in order to recover the full amount of the Policy proceeds.

WHEREFORE, Felman respectfully requests that this Court enter judgment in its favor for all damages that Felman sustains as a consequence of the Insurers' bad faith acts, including but not limited to amounts that Felman has incurred to obtain a declaration that the Insurers are obligated to pay for damage to the Furnace #2 transformer and for the business interruption loss, as well as the amounts of Felman's loss arising from the Insurers' delay, damages for Felman's inconvenience and aggravation, and the attorney's fees Felman incurred in vindicating its claim, and that this Court further order that the Insurers are obligated to reimburse Felman for its costs and such further necessary or proper relief based on the declaratory judgment or decree as this Court may deem appropriate.

## COUNT V
## HAYSEEDS CLAIM

85.    The allegations set forth in paragraphs 1 through 84 are incorporated herein by reference.

86.    Although the Insurer defendants have received due notice and satisfactory proof of loss, and although Felman is in full compliance with all the terms and conditions of the Policy, or is excused with complying with such conditions because of the Insurers refusal to enter a tolling

agreement in good faith, defendant Insurers have willfully and intentionally failed and refused to pay Felman the full coverage amounts of the policy to which defendant insurers know Felman is entitled.

WHEREFORE, plaintiff Felman demands judgment from defendants Industrial Risk Insurers, Westport Insurance Company, and Swiss Reinsurance America Corporation, jointly and severally, as follows:

(i)    Compensatory damages of $25,000,000.00, the full amount of all applicable coverages under the Policy, including property damage and business interruption coverages;

(ii)   Compensatory damages in an amount to be determined by the jury for plaintiff's additional consequential economic losses and expenses;

(iii)  Plaintiff's reasonable attorney fees and costs expended in the prosecution of this cause;

(iv)   Prejudgment and post-judgment interest as provided by law; and

(v)    Such other relief as this Court may deem just.

PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Respectfully Submitted,

FELMAN PRODUCTION, INC.
By Counsel:

Michael W. Carey, WVSB No. 635
S. Benjamin Bryant, WVSB No. 520
Carey, Scott & Douglas, PLLC
901 Chase Tower
707 Virginia Street, East
P.O. Box 913

Charleston, WV 25323
Tel.:  (304) 345-1234
Fax:  (304) 342-1105
Email: mwcarey@csdlawfirm.com
          sbbryant@csdlawfirm.com