UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON

MT. HAWLEY INSURANCE COMPANY,

   Intervenor Plaintiff,

v.

FELMAN PRODUCTION, INC.,

   Plaintiff,

v.           Case No. 3:09-cv-00481

INDUSTRIAL RISK INSURERS,
WESTPORT INSURANCE COMPANY, and
SWISS REINSURANCE AMERICA CORPORATION,

   Defendants.


<u>MEMORANDUM OPINION AND ORDER</u>

  This case raises issues concerning the attorney-client privilege and the crime-fraud exception in the context of a massive production of e-discovery. The action concerns Felman Production, Inc.'s claim on its property damage and business interruption loss insurance policy attributable to the failure of a transformer for a silicomanganese furnace. On April 8, 2010, the undersigned conducted a hearing on various discovery disputes. Based on various factual assertions by the parties, the court took under advisement Defendants' motions to compel and for protective order (docket # 283) and ordered briefing on attorney-client privilege issues relating to an email which was inadvertently produced by

plaintiff Felman Production, Inc. ("Felman") to Defendants. Felman filed its brief on the applicability of the privilege (# 323), Defendants filed their response (# 325), and Felman filed its reply (# 329). Defendants filed their brief on the crime-fraud exception to the privilege (# 322), Felman filed its response (# 326), and Defendants filed their reply (# 328).

These motions were triggered by Defendants' receipt, through discovery, of a May 14, 2008, email from the Human Resource Manager at Felman, to Tom Sullivan and Gene Burd, attorneys at Marks Sokolov & Burd, LLC, outside counsel to Felman. Mr. Burd replied to the email, with a copy to Katerina Vatutina of Privat Intertrading Company. (# 283, at 1-2; # 283-4, at 2.) Defendants contend that the May 14 email is evidence of a fraudulent scheme by Felman executives and others to present and advocate a false proof of loss and insurance claim to Defendants relating to the failure of a transformer which rendered Felman's Furnace # 2 inoperable. Id. Defendants argue that the crime-fraud exception vitiates any confidential communication in the May 14 email and any related documents, that the attorney-client privilege was waived when the communication was disclosed to Ms. Vatutina, and that Felman failed to take reasonable precautions to prevent disclosure of allegedly privileged communications. Id. at 2.

Felman has demanded return of the May 14 email, pursuant to Federal Rule of Civil Procedure 26(b)(5)(B), Federal Rule of

Evidence 502(b) and Section H of the Stipulation Regarding the Discovery of Electronically Stored Information ("ESI Stipulation") (# 47, at 6-7), noting that the email is listed on Felman's privilege log.    Felman contends that the disclosure was inadvertent, that Defendants have misused the inadvertently produced document, that the crime-fraud exception does not apply, and that the attorney-client privilege was not waived.  (# 314.)

## Procedure Regarding Claw-back

The first issue raised is Felman's complaint that Defendants are violating the Rules and the ESI Stipulation (# 47) by refusing to return the May 14 email and other apparently privileged documents.  (# 326, at 4-7.)  As noted, the May 14 email was inadvertently produced by Felman to Defendants in January 2010 as part of a massive disclosure of e-discovery, of which approximately 30% of the pages were irrelevant.  Defendants have termed the production a classic "document dump."  (# 283, at 1.)

Felman learned of the production of the May 14 email on March 11, 2010, when Defendants attached it to a motion to amend their answer to add a counterclaim for fraud and breach of contract (# 265, Ex. E).  By letter dated March 15, 2010, Felman demanded its return and destruction of "all copies," noting that the May 14 email was listed on Felman's privilege log (# 323, Ex. B).[1]  Felman

---

[1]  Felman used a different numbering system for its privilege log, so it was not immediately apparent that one version of the May 14 email was on the privilege log.

3

also requested that Defendants "promptly return the originals of [similar or other documents that Felman might have inadvertently included in its production] . . ., and destroy all copies [of] same." Id.

By letter dated March 16, 2010, Defendants requested a meet and confer pursuant to the third paragraph of Section H of the ESI Stipulation, and asserted three reasons for refusing to return the May 14 email: crime-fraud exception to the attorney-client privilege; disclosure to a third person (Katerina Vatutina); and Felman's failure to take reasonable precautions to prevent the disclosure. (# 323, Ex. C.) Defendants declined to review Felman's production to determine whether there were additional documents that might have been inappropriately produced, noting that it is not their obligation to conduct Felman's privilege review. Id.

Felman contends that Defendants are obliged to return the May 14 email pursuant to Rule 26(b)(5)(B) and Paragraph H of the ESI Stipulation. (# 323, at 6.)

Defendants respond that they have complied with the ESI Stipulation and Rules 26 and 502. (# 325, at 16.) They assert that they had no obligation to notify Felman of the inadvertent production of the May 14 email. Id. at 17.

Felman's reply argues that Rule 26(b)(5)(B) explicitly requires return or destruction of the May 14 email, that

4

Defendants' claim that they were preparing for depositions is disingenuous, and that Defendants knew that the May 14 email was privileged. (# 329, at 9-12.)

The production of the May 14 email must be considered in the context of the overall e-discovery production by Felman. Defendants served requests for production of documents on August 7, 2009 (# 21). Felman and its counsel used various search protocols, software and vendors' services to search for and produce documents. Their efforts are detailed in Exhibits G, H and I of Felman's Brief (# 323) and Exhibit C of Felman's Reply (# 329). The great majority of the e-discovery was produced to Defendants in January, 2010, five months after the requests were served. The court notes this five month period because Felman has pressed for a quick resolution of this litigation and repeatedly complained that Defendants were unduly delaying the proceedings. When Felman finally made its e-discovery production, it marked each and every document as "Confidential." By Memorandum Opinion and Order entered March 25, 2010, the undersigned found that "Felman's marking of each page of discovery documents as **'CONFIDENTIAL'** violates this Court's Local Rule 26.4 and makes a mockery of the Court's form protective order." (# 297, at 4.) As noted above, Felman's production also included a large number of irrelevant materials; Defendants have asserted that at least 14.3 gigabytes of "junk documents" were included, comprising more than 30% of the

production of roughly one million pages (# 285, at 2).   Thus Defendants have incurred great expense in reviewing documents which should never have been produced.

The May 14 email is the proverbial tip of the iceberg. Defendants, arguing that Felman failed to take reasonable steps to protect privileged communications, identified nearly 980 attorney-client communications which were produced, of which Felman has now recalled 377.  (# 325, at 4 and Ex. D.)  Some of the communications are listed on the privilege log, but Felman has not recalled them. Id. at 5.

Felman, in its defense, states that it has undertaken a massive re-review of its e-discovery production, having acknowledged its production of irrelevant ESI, overdesignation of confidential ESI and production of privileged documents to Defendants.  (# 329, at 3.)  Felman has recalled privileged documents and is revising its privilege log.  Id.

Rule 26(b)(5)(B)

Federal Rule of Civil Procedure 26(b)(5)(B) provides as follows:

> **(5) Claiming Privilege or Protecting Trial-Preparation Materials.**
>
> * * *
>
> **(B)** *Information Produced.*  If information produced in discovery is subject to a claim of privilege or of protection as trial-preparation material, the party making the claim may notify any party that received the

> information of the claim and the basis for it.
> After being notified, a party must promptly
> return, sequester, or destroy the specified
> information and any copies it has; must not
> use or disclose the information until the
> claim is resolved; must take reasonable steps
> to retrieve the information if the party
> disclosed it before being notified; and may
> promptly present the information to the court
> under seal for a determination of the claim.
> The producing party must preserve the
> information until the claim is resolved.

The Rule clearly places the burden of claiming privilege and notifying other parties on the party who produced the information. This burden is of course consistent with the well-settled rule that the party claiming a privilege or protection has the burden of establishing its entitlement thereto. United States v. Jones, 696 F.2d 1069, 1072 (4th Cir. 1982). Rule 26(b)(5)(B) imposes no duty on a party receiving privileged information to do anything unless and until it is notified of the claim.

Once notified of an inadvertent production of a privileged document, Rule 26(b)(5)(B) explicitly requires return, sequestration, or destruction of the document and any copies of it. Defendants have refused to return or to destroy the May 14 email. They are silent as to sequestration.

The Rule prohibits Defendants from using or disclosing the information until the claim is resolved and requires Defendants to take reasonable steps to retrieve the information if Defendants disclosed it before being notified of the attempted claw-back. Defendants have the right to present the information to the court

under seal for a determination of the claim.

Section H of the ESI Stipulation

The ESI Stipulation by the parties (which was not incorporated into a court order) provides as follows:

**H.   Inadvertent Production of Documents.**

A party may seek the return (and/or destruction, as the case may be) of any document produced in response to discovery requests in this action that the party later claims should have been withheld on grounds of a privilege, including the work product doctrine (collectively referred to hereinafter as an "Inadvertently Produced Document").

A party may request through counsel the return of any document ("Notice of Recall") that it inadvertently produced by identifying the Inadvertently Produced Document and stating the basis for withholding such document from production within ten (10) business days of discovery of the inadvertent production. Once the Notice of Recall is given by the producing party, the receiving party shall, within five (5) business days of receiving the request, return all copies of the document and confirm in writing that all copies have been destroyed. The producing party will send a replacement disk containing all non-privileged documents that were contained on the original production disk. Electronic copies of the Inadvertently Produced Document will be removed from the electronic system of the receiving party. The producing party shall add the subject document to its privilege log and provide the updated Privilege Log to the receiving party. If the Inadvertently Produced Document requires redaction only, the producing party shall within thirty (30) days of the Notice of Recall, provide to the receiving party a redacted version of the document and an updated privilege log by submitting a replacement disk containing the original production with the redacted documents included. The return of an Inadvertently Produced Document does not preclude the receiving party from disagreeing with the designation of the document as privileged or redacted and re-produced and bringing a Motion to Compel its production pursuant to the Federal Rules of Civil Procedure.

> If the Notice of Recall is made during or in preparation for a deposition, the examining and defending counsel shall meet and confer at the earliest opportunity to determine appropriate steps under this circumstance and consistent with this Stipulation to return the document, redact the document or withdraw the claim of privilege.
>
> Compliance by the producing party with the steps required by this Section H to retrieve an Inadvertently Produced Document shall be sufficient, notwithstanding any argument by a party to the contrary, to satisfy the reasonableness requirement of FRE 502(b)(3).

(# 47, at 6-7.)

The ESI Stipulation, like Rule 26(b)(5)(B), puts the burden of identifying Inadvertently Produced Documents on the producing party, not the receiving party. By letter dated March 15, 2010, Felman complied with the Stipulation's requirement that it give its Notice of Recall of the May 14 email within ten business days of discovery of the inadvertent production, as to one version of the May 14 email (# 323, Ex. B). The letter, consistent with the second paragraph of Section H, included a demand for return of the original and destruction of "all copies." Id. Apparently Felman produced two versions of the May 14 email, with different Bates numbers. (# 325, at 8.) Defendants disclosed the production of the second version of the May 14 email on April 7, 2010, and Felman recalled the second version on April 21, 2010, the tenth business day after April 7, and the 29th business day after March 11. Id.

Defendants assert that the Notice of Recall was made during or in preparation for a deposition, implying that this circumstance makes a difference (# 323, Ex. C; # 325, at 18). In its Reply,

9

Felman disputes this point, noting that the May 14 email was not used at the three depositions taken since March 15, when Felman demanded its return.   (# 329, at 10.)   The ESI Stipulation explicitly provides that if a Notice of Recall is made during or in preparation for a deposition, "the examining and defending counsel shall meet and confer at the earliest opportunity to determine appropriate steps under this circumstance and consistent with this Stipulation to return the document, redact the document or withdraw the claim of privilege."   (# 47, at 7.)   Counsel for Defendants requested the meet and confer, but the parties were unable to agree, and these motions ensued.

Since March 31, 2010, the parties have postponed ten depositions which were scheduled for April 5, 6, 7, 12, 15, 22, 23 and 27, (# 329, Ex. F), presumably because the court suspended discovery deadlines while numerous discovery disputes are being resolved (Order entered March 25, 2010, # 294).   The court assumes that the May 14 email was discovered by Defendants during their review of Felman's e-discovery production and in preparation for depositions, but that does not resolve the dispute.

The third paragraph of Section H of the ESI Stipulation provides that the parties should meet and confer "to determine appropriate steps under this circumstance *and consistent with this Stipulation to return the document, redact the document or withdraw the claim of privilege.*" [Emphasis supplied.]  Return of the

10

document is consistent with the second paragraph of Section H, which requires prompt return of the document and confirmation of the destruction of all copies of it.  Redaction of the document is similarly consistent with the second paragraph of Section H. Withdrawal of the claim of privilege is consistent with the last portion of the second paragraph regarding the parties' option to litigate the designation of a document as privileged.  In other words, the third paragraph of Section H is consistent with the second paragraph and does not amend or vitiate it.

The court finds that Defendants have failed to comply with Section H of the ESI Stipulation.  The court further finds that Felman, the producing party, complied with Section H in its effort to retrieve the May 14 email, an Inadvertently Produced Document.

<u>Ethical Considerations</u>

In its brief on the crime-fraud exception, Felman argues that Defendants acted improperly by using the May 14 email and placing it on the public record, and implies that Defendants' counsel acted unethically.  (# 326, at 6-7.)  In support of their assertion, Felman cites several cases, which the court has reviewed.  In <u>Cars R Us Sales and Rentals, Inc. v. Ford Motor Co.</u>, No. 08-cv-50270, 2009 WL 1703123, at *4 (N.D. Ill. June 18, 2009), the court found the subject document, "Litigation Agreement," to be neither "sensitive" nor privileged, although it was subject to work product protection.  Counsel was admonished but not disqualified for

11

placing the document on the public record.  In <u>Employers Ins. Co.</u>
<u>of Wausau v. Skinner</u>, No. 07-cv-735, 2008 WL 4283346, at *11
(E.D.N.Y. Sept. 17, 2008), the court noted the American Bar
Association's Standing Committee on Ethics and Professional
Responsibility's ("the Committee") Formal Opinion 92-368 (1992).
In <u>Richards v. Jain</u>, 168 F. Supp.2d 1195, 1201 (W.D. Wash. 2001),
the court discussed the ethical duties of attorneys and paralegals
who receive inadvertently produced privileged documents and cited
to the Committee's Formal Opinion 94-382 (1994).

Formal Opinion 92-368 was withdrawn on October 1, 2005 in the
Committee's Formal Opinion 05-437, "Inadvertent Disclosure of
Confidential Materials."  In Opinion 05-437, the Committee noted
that it must look to Model Rule of Professional Conduct 4.4(b),
which reads: "A lawyer who receives a document relating to the
representation of the lawyer's client and knows or reasonably
should know that the document was inadvertently sent shall promptly
notify the sender."  Opinion 05-437 provides as follows:

> A lawyer who receives a document from opposing
> parties or their lawyers and knows or reasonably should
> know that the document was inadvertently sent should
> promptly notify the sender in order to permit the sender
> to take protective measures.

The Committee noted that Rule 4.4(b) "does not require the
receiving lawyer either to refrain from examining the materials or
to abide by the instructions of the sending lawyer."

Formal Opinion 94-382 was withdrawn on May 13, 2006 in the

Committee's Formal Opinion 06-440, "Unsolicited Receipt of Privileged or Confidential Materials."   Opinion 06-440 provides in pertinent part as follows:

> The Rule does not require refraining from reviewing the materials or abiding by instructions of the sender.
>
> * * *
>
> It further is our opinion that if the providing of the materials is not the result of the sender's inadvertence, Rule 4.4(b) does not apply to the factual situation addressed in [withdrawn] Formal Opinion 94-382. A lawyer receiving materials under such circumstances is therefore not required to notify another party or that party's lawyer of receipt as a matter of compliance with the Model Rules.  Whether a lawyer may be required to take any action in such an event is a matter of law beyond the scope of Rule 4.4(b).

The court will disregard the cases cited by Felman which cite to the withdrawn Opinions.   Neither the West Virginia Rules of Professional Conduct nor the West Virginia Standards of Professional Conduct address the issue.

Defendants respond that they "had no way of knowing that Felman inadvertently produced the May 14 email."  (# 325, at 17.) In support of this assertion, they point to the disclosure to Katerina Vitutina, the production of thousands of emails with attorneys' names, and the evidence of intent to engage in fraud. Id.  Defendants argue that neither Rule 26(b)(5) nor the ESI Stipulation places an obligation on Defendants to notify Felman of the disclosure.  Id.

In its Reply, Felman notes that inadvertent production of

13

privileged materials is an inevitable result of large-scale document production. (# 329, at 9.) It argues that Defendants are in violation of Rule 26(b)(5)(B), the ESI Stipulation, and ABA Formal Opinion 05-437. Id. at 10-12.

As noted above, both Rule 26(b)(5)(B) and the ESI Stipulation place the responsibility for making a claw-back on the producing party. Despite the provisions of Formal Opinions 05-437 and 06-440 and Model Rule 4.4(b), no West Virginia Rule or Standard of Professional Conduct requires notification to the producing party by the receiving party of the inadvertent disclosure of a privileged document. The court declines to rule that Defendants were in error by failing to notify Felman of the production of the May 14 email prior to using it.

### Applicability of the Attorney-Client Privilege

This court has jurisdiction over this case based on diversity of citizenship. (Complaint, # 1, ¶ 7, at 2.) Pursuant to Federal Rule of Evidence 501, the privilege "shall be determined in accordance with State law."

As the bearer of the burden of proof that the May 14 email is a privileged attorney-client communication, Felman must satisfy the test set forth in State v. Burton, 254 S.E.2d 129, 135 (W. Va. 1979), and subsequent cases:

> In order to assert an attorney-client privilege, three main elements must be present: (a) both parties must contemplate that the attorney-client relationship does or will exist; (2) the advice must be sought by the client

from the attorney in his capacity as a legal adviser; (3)
the communication between the attorney and client must be
intended to be confidential.

As noted in <u>Chambers v. Allstate Ins. Co.</u>, 206 F.R.D. 579, 589 (S.D. W. Va. 2002), there is a fourth element, that there must be no evidence that the client intentionally waived the privilege. There is no question that Felman's human resources manager, the author of the May 14 email, was an employee of Felman, a client of Marks Sokolov & Burd, LLC, a law firm, and that the lawyer-recipients (Messrs. Sullivan and Burd) were acting as lawyers in connection with Felman's insurance claim. The communication relates to a matter in which the attorneys were serving as legal advisers. It appears that the email was intended to be confidential. The court finds that Felman has met the first, second and third elements of the <u>Burton</u> test. Defendants contend that the communication was for the purpose of committing a crime or tort, and was made to a third person (Katerina Vatutina of Privat Trading). Defendants also assert that Felman waived the privilege. Felman denies the applicability of the crime-fraud exception, argues that Katerina Vatutina is not a "stranger" and claims the privilege.

In making a response to the email, Mr. Burd provided a copy to Ms. Vatutina. It is well-settled that the client is the holder of the privilege.

Although the client is the holder of the privilege,
it is ordinarily the attorney's obligation to claim the

privilege on the client's behalf, even in the client's absence.   Indeed, in most instances, it is through actions taken or not taken by counsel that courts find a waiver has occurred.   Therefore, the attorney's failure to assert the privilege or the attorney's carelessness in dealing with privileged materials or even the attorney's good faith desire to obtain assistance on a case from experts, may result in a waiver.  Prudent counsel must be sure to protect the privilege by actions taken if the privilege is to be preserved properly.

Edna Selan Epstein, <u>The Attorney-Client Privilege and the Work Product Doctrine</u>, 270 (4th Ed. 2001).

Felman argues that Mr. Burd was not authorized to waive the privilege by disclosing the May 14 email to Ms. Vatutina, and that Mr. Burd considered Ms. Vatutina to be an insider, not a third party. (# 323, at 8.) Felman submits affidavits from Mr. Burd and Ms. Vatutina in support of these contentions. <u>Id.</u>, Exs. E and F.

Mr. Burd's affidavit states that, as outside corporate counsel for Felman, he knows that in 2007 and 2008, Felman was managed by Privat Intertrading, which oversaw Felman's operations, including sales of Felman's silicomanganese product. <u>Id.</u>, Ex. E, ¶ 3, at 1.

5.   In 2008, I routinely copied Ms. Vatutina on e-mails regarding Felman and its operations.   I did so because (a) at that time, Ms. Vatutina on behalf of Privat was charged with overseeing Felman's operations and (b) in light of her supervisory role, I deemed her to be an essential participant in privileged communications regarding Felman and its operations. I certainly did not consider her to be a third party or outsider such that including her in a Felman attorney-client privileged communication might waive Felman's attorney-client privilege.   Moreover, Felman has never consented to waiving the attorney-client privilege as to its communications with me.

<u>Id.</u>, ¶ 5, at 2.

16

Ms. Vatutina's affidavit[2] states that in 2008, she worked for Privat Trading, which had a consulting services agreement with Feral, Ltd., which in turn had a consulting services agreement with Felman.  Id., Ex. F, ¶ 2, at 1; # 329, Ex. H, ¶ 2, at 1.  She indicates that she "further[ed] this consulting relationship by working exclusively on Felman-related matters [and] . . . communicated in 2008 with Felman's attorneys at Marks & Sokolov regarding various Felman-related matters."  Id., ¶¶ 3-4.  Felman did not submit an affidavit from any of its executives regarding Ms. Vatutina's role.

Defendants complain that "Felman's positions regarding Katerina Vatutina are inconsistent with the positions it has taken thus far in discovery."  (# 325, at 14.)  They advise that in verified discovery responses, Felman stated that "'there are no individuals from the Privat Group that have first-hand knowledge of any facts pertaining to Felman's Claim.'"  Id. at 15 [citation to Felman's discovery responses not provided].  Defendants also assert that Ms. Vatutina's affidavit is ambiguous, noting that Privat's consulting agreement with Felman was not provided.  Id.  They point out the absence of any sworn statement by a Felman executive regarding her role.  Finally, Defendants argue that Mr. Burd "was acting with Felman's permission when he forwarded the May 14 email

---

[2]   Ms. Vatutina's original affidavit was not made under penalties of perjury.  The omission was corrected in Exhibit H to Felman's Reply (# 329).

to Ms. Vatutina."  Id. at 16.

The Court relies on Mr. Burd's and Ms. Vatutina's affidavits, and finds that Ms. Vatutina, as a consultant, acted on behalf of Felman and was within the scope of the privilege.  See In re Copper Market Antitrust Litig., 200 F.R.D. 213, 219-20 (S.D.N.Y. 2001) (privilege extended to public relations firm advising the company and consulting with its attorneys on litigated matters); McCaugherty v. Siffermann, 132 F.R.D. 234, 239 (N.D. Cal. 1990) (no principled basis for distinguishing consultant's communications with attorneys and corporate employee's communications with attorneys).  Accordingly, the court finds that Mr. Burd did not purportedly waive the privilege by including Ms. Vatutina in his reply to the May 14 email.[3]

The next issue is whether Felman waived the privilege when it produced the May 14 email.  Felman argues that its efforts to claw-back the May 14 email satisfy the reasonableness requirement of Rule 502(b)(3) (as set forth in Section H of the ESI Stipulation), that its production of the May 14 email was inadvertent and that Felman took reasonable steps to prevent its inadvertent disclosure. (# 323 at 11-12.)  Felman points to its "carefully selected privilege search terms," document-by-document review of potentially privileged documents, and a second electronic search of remaining

---

[3]   Issues relating to Felman's verified discovery responses concerning Privat's and Ms. Vatutina's roles will not be addressed in this Memorandum Opinion and Order.

18

documents, as evidence of its reasonable steps. Id. at 12. It notes that the May 14 email was listed on its privilege log. Id. After learning of the production of apparently privileged materials, Felman investigated and determined that certain documents were not tagged for attorney review due to an undetermined software error. Id. at 12-13.

Defendants assert that Felman did not take reasonable precautions to avoid disclosure of the May 14 email and other allegedly privileged communications and thereby waived the privilege. (# 325, at 3-7.) They compiled a list of the defects in Felman's e-discovery and contend that Felman's production fails the five-factor test set forth in Victor Stanley, Inc. v. Creative Pipe, Inc., 250 F.R.D. 251 (D. Md. 2008). Id.

Felman's Reply accuses Defendants of engaging in speculation and hyperbole with little or no support. (# 329, at 1.) It contends that its efforts to prevent disclosure were reasonable, and that its claw-back satisfied Rule 502(b)(3), "notwithstanding any argument to the contrary." Id. at 4, n.2.

The five-factor test set forth in Victor Stanley, prior cases and the Advisory Committee Notes to Rule 502(b) is generally stated as follows:

> The intermediate test requires the court to balance the following factors to determine whether inadvertent production of attorney-client privileged materials waives the privilege: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure; (2) the number of inadvertent disclosures; (3) the extent of the

disclosures; (4) any delay in measures taken to rectify the disclosure; and (5) overriding interests in justice.

Victor Stanley, 250 F.R.D. at 259.  Victor Stanley was decided shortly before the enactment of Rule 502(b), which states as follows:

> The following provisions apply, in the circumstances set out, to disclosure of a communication or information covered by the attorney-client privilege or work-product protection.
>
> * * *
>
> **(b) Inadvertent disclosure.**  When made in a Federal proceeding . . ., the disclosure does not operate as a waiver in a Federal . . . proceeding if
>> **(1)** the disclosure is inadvertent;
>> **(2)** the holder of the privilege or protection took reasonable steps to prevent disclosure; and
>> **(3)** the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B).

Fed. R. Evid. 502(b).

The court will apply Rule 502(b), considering Victor Stanley and similar cases as to reasonableness.  There is no dispute that Felman's disclosure of the May 14 email was inadvertent, and the court so finds.  Therefore Rule 502(b)(1) is satisfied.

The court has found that Felman's notice of recall complied with Section H of the ESI Stipulation; thus pursuant to the last paragraph of Section H, and "notwithstanding any argument to the contrary," the court finds that Rule 502(b)(3) is satisfied.

The remaining issue is whether Felman took reasonable steps to

prevent disclosure in the first place.   The Advisory Committee Notes on Rule 502(b) recite the five-factor test and then make the following remarks:

> The rule does not explicitly codify that test, because it is really a set of non-determinative guidelines that vary from case to case.   The rule is flexible enough to accommodate any of those listed factors.   Other considerations bearing on the reasonableness of a producing party's efforts include the number of documents to be reviewed and the time constraints for production. Depending on the circumstances, a party that uses advanced analytical software applications and linguistic tools in screening for privilege and work product may be found to have taken "reasonable steps" to prevent inadvertent disclosure.   The implementation of an efficient system of records management before litigation may also be relevant.

> The rule does not require the producing party to engage in a post-production review to determine whether any protected communication or information has been produced by mistake.   But the rule does require the producing party to follow up on any obvious indications that a protected communication or information has been produced inadvertently.

A letter from the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States to the Committee on the Judiciary of the United States Senate and House of Representatives, dated September 26, 2007, identified the problems addressed by FRE 502:

> In drafting the proposed Rule, the Advisory Committee concluded that the current law on waiver of privilege and work product is responsible in large part for the rising costs of discovery, especially discovery of electronic information.   In complex litigation the lawyers spend significant amounts of time and effort to preserve the privilege and work product.   The reason is that if a protected document is produced, there is a risk that a court will find a subject matter waiver that will

apply not only to the instant case and document but to
other cases and documents as well. Moreover, an enormous
amount of expense is put into document production in
order to protect against inadvertent disclosure of
privileged information, because the producing party risks
a ruling that even a mistaken disclosure can result in a
subject matter waiver. Advisory Committee members also
expressed the view that the fear of waiver leads to
extravagant claims of privilege. Members concluded that
if there were a way to produce documents in discovery
without risking subject matter waiver, the discovery
process could be made much less expensive.

The Advisory Committee Notes contain an "Addendum," titled

"Statement of Congressional Intent Regarding Rule 502 of the

Federal Rules of Evidence." That Statement contains comments on

"Subdivision (b) - Fairness Considerations," as follows:

> The standard set forth in this subdivision for
> determining whether a disclosure operates as a waiver of
> the privilege or protection is . . . the majority rule in
> the federal courts. The majority rule has simply been
> distilled here into a standard designed to be predictable
> in its application. This distillation is not intended to
> foreclose notions of fairness from continuing to inform
> application of the standard in all aspects as appropriate
> in particular cases – for example, as to whether steps
> taken to rectify an erroneous inadvertent disclosure were
> sufficiently prompt under subdivision (b)(3) where the
> receiving party has relied on the information disclosed.

Federal Rule of Evidence 102 reminds us that

> [t]hese rules shall be construed to secure fairness in
> administration, elimination of unjustifiable expense and
> delay, and promotion of growth and development of the law
> of evidence to the end that the truth may be ascertained
> and proceedings justly determined.

Similarly, Federal Rule of Civil Procedure 1 provides that those

rules "should be construed and administered to secure the just,

speedy, and inexpensive determination of every action and

proceeding."

The Court notes that in <u>Victor Stanley</u>, Magistrate Judge Grimm remarked that "[t]he only prudent way to test the reliability of the keyword search is to perform some appropriate sampling of the documents determined to be privileged and those determined not to be in order to arrive at a comfort level that the categories are neither over-inclusive nor under-inclusive." <u>Victor Stanley</u>, 250 F.R.D. at 257.  Felman's counsel participated in the <u>Victor Stanley</u> case "after all the events that are relevant . . . had taken place." <u>Id.</u> at 255 n.4.

The Court has reviewed materials and arguments provided by the parties regarding the steps taken by Felman to prevent disclosure of privileged materials, including all the briefs, all the affidavits, the ESI Stipulation, and cited cases.  Based on this review, and particularly relying on the affidavit of Alexander W. Major, Esq., the court finds that Felman and its counsel took the following steps to produce relevant records yet prevent disclosure of privileged materials:

- Negotiated the ESI Stipulation with Defendants
- Hired an ESI collection vendor, Innovative Discovery
- Discussed with Felman's Information Technology Department the computer network structure at Felman and identified potential sources of relevant ESI
- Visited Felman's West Virginia plant to coordinate and oversee ESI collection
- Decided to collect data using forensic imaging
- Directed the vendor to collect ESI from the current server and the backup server
- Collected 1,638 gigabytes of data
- Downloaded emails from 29 custodians for processing by Venable

- Hired a new vendor to process Felman's Oracle and Soloman databases
- Identified the first six workstations to be processed and learned that each contained more data than anticipated
- Examined methods to cull non-relevant materials
- Selected search terms to retrieve documents responsive to Defendants' document requests
- Tested the search terms against the Felman emails and added additional search terms
- Tested the search terms, including the additional terms, against the Felman emails, tagged responsive documents, and set them aside for privilege review
- Produced 17,064 Excel spreadsheets in November, 2009
- Selected "Privilege Search Terms" to identify materials which are potentially privileged and relevant
- Set aside potentially privileged materials for individualized document-by-document review for relevancy and privilege
- Tested Privilege Search Terms against Felman's emails
- Retrieved native files of all images and examined thumbnails
- Conducted "eyes-on" review of all documents identified both as relevant and potentially privileged
- Decided to use a vendor to complete the processing of Felman's emails
- Produced ESI in native or .TIF format, with 36 fields of metadata
- Produced more than 346 gigabytes of data without sampling for relevancy, over-inclusiveness or under-inclusiveness
- Marked all 346 gigabytes of data as **"CONFIDENTIAL."**

(# 314, Ex. I.)  After Defendants complained that Felman had produced a large quantity of irrelevant material, Felman began a document-by-document review of all materials produced.  Id.

Based on the materials submitted and the affidavits of Donna Anderson, Venable LLP's Practice Technologies Manager, and David N. Cinotti, Esq., the court further finds as follows:

- The vendor Innovative Discovery processed Felman's ESI, applied the relevance search terms and then posted the responsive data as 13 Concordance database files to a secure website for Venable to download and apply Privilege Search Terms
- The fourth Concordance database file was processed in a manner similar, if not identical, to other database files, and

24

Privilege Search Terms were applied to it
- The May 14 email originated from the fourth Concordance database file
- After learning of the inadvertent disclosure, investigation revealed that the fourth Concordance database file inexplicably built an incomplete index of potentially privileged materials
- The manufacturer of the Concordance software, Lexis-Nexis, has not been able to explain why the index was incomplete
- When Defendants contended that 966 documents produced by Felman were potentially privileged, Felman and Venable determined that 377 of those documents were privileged and that 328 came from the fourth Concordance database file.

(# 323, Exs. G and H.)

Based on the materials submitted and particularly Defendants' Response in Opposition to Plaintiff's Opening Brief on Application of Attorney-Client Privilege, the court finds as follows:

- Felman over-produced documents to Defendants by more than 30%
- Venable undertook to process and review Felman's emails until December 19, 2009
- Felman produced 377 documents which it now claims are privileged
- The production of 377 documents which are now claimed to be privileged is not solely attributable to the problem with the fourth Concordance database file
- Some documents on Felman's privilege log were produced and not clawed-back
- Some documents claimed by Felman to be privileged are not on the original privilege log
- Felman and Venable failed to perform critical quality control sampling to determine whether their production was appropriate and neither over-inclusive nor under-inclusive, even though Venable was counsel in the Victor Stanley case
- Felman and Venable apparently failed to perform simple keyword searches to locate copies of the May 14 email which were produced and to identify documents which comprise attorney communications
- Felman's post-production claw-backs appear to be based on notifications by Defendants and not on its own review.

The Court will apply the five-factor test discussed above in the context of these findings and the commentary to the Rules.

25

First, the precautions taken to prevent inadvertent disclosure were not reasonable.  As warned in <u>Victor Stanley</u>, 250 F.R.D. at 257, the failure to test the reliability of keyword searches by appropriate sampling is imprudent.  Second, the number of inadvertent disclosures is large, more than double the number discussed in <u>Victor Stanley</u>, a number which underscores the lack of care taken in the review process.  The May 14 email resonates throughout this case – a bell which cannot be unrung.  Its content has had great influence on Defendants' discovery requests and deposition questions.  Confidentiality cannot be restored to that document.  Third, the extent of the disclosures is not known to the Court because the 377 documents have not been submitted *in camera*.  Fourth, there has been delay in measures taken to rectify the disclosure of the documents.  It is an important fact that identification of privileged documents which were disclosed to Defendants was made by the Defendants, not Felman or its counsel.  Finally, as in <u>Victor Stanley</u>, <u>id.</u> at 263, Felman has "pointed to no overriding interests in justice that would excuse them from the consequences of producing privileged/protected materials."

The court finds that Felman and Venable did not take reasonable steps to prevent disclosure of the May 14 email, that Felman and Venable have not satisfied all three subsections of Rule 502(b), and that they have waived protection for the May 14 email.

The 377 additional documents which are the subjects of

26

Felman's April 21 claw-back were not the focus of the parties' briefing, although they were extensively addressed.

### Crime-Fraud Exception

In United States v. Zolin, 491 U.S. 554, 574 (1989), the Supreme Court held

> that *in camera* review may be used to determine whether allegedly privileged attorney-client communications fall within the crime-fraud exception. We further hold, however, that before a district court may engage in *in camera* review at the request of the party opposing the privilege, that party must present evidence sufficient to support a reasonable belief that *in camera* review may yield evidence that establishes the exception's applicability. Finally, we hold that the threshold showing to obtain *in camera* review may be met by using any relevant evidence, lawfully obtained, that has not been adjudicated to be privileged.

The West Virginia Supreme Court of Appeals adopted the holding in Zolin in State ex rel. Allstate Ins. Co. v. Madden, 601 S.E.2d 25, 38-39:

> [W]e reiterate the tenets of *Zolin* set forth above and hold that to establish the application of the crime-fraud exception, a party must demonstrate an adequate factual basis exists to support a reasonable person's good faith belief that an *in camera* review of the privileged materials would produce evidence to render the exception applicable. In making this *prima facie* showing, the party must rely on nonprivileged evidence, unless the court has not previously made a preliminary determination on the matter of privilege, in which case the allegedly privileged materials may also be considered. * * * The crime-fraud exception operates to compel disclosure of otherwise privileged materials only when the evidence establishes that the client intended to perpetrate a crime or fraud and that the confidential communications between the attorney and client were made in furtherance of such crime or fraud.

Defendants submit that Felman's business interruption claim is

27

"premised on Felman <u>running</u> all three furnaces at the same time during the entire eight-month period and <u>selling</u> the entire production from all three furnaces during the eight-month period." (# 322, at 2.)  Felman does not dispute this characterization of their claim on the policy.

The May 14 email is from Denys Dolzhykov, Felman's Human Resource Manager, to Tom Sullivan and Gene Burd.  In the email, the writer confirms his understanding that Felman "need[s] to show some kind of sales contract on the amount of production equal to production of all three furnaces."  (# 283-4, at 2.)  He then comments that Felman does not have sales contracts for production from three furnaces, just two.  <u>Id.</u>  He reports that he discussed with customers the possibility of signing back-dated sales contracts, but the customers' lawyers "didn't like this option." <u>Id.</u>  Denys indicates that the customers were

> ready to ma[k]e official letter to Felman saying that because of our problem with transformer they will not receive from us necessary amount of metal to cover their contracts and that they [are] losing money and market because we cannot supply them with metal (something like this).  What do you think - what . . . will be b[e]tter for insurance company - to have this letter or contract?"

<u>Id.</u>  Attorney Burd responded that the "insurance company may request any document relating to damages issue.  Therefore all relevant documents need to be reviewed."  <u>Id.</u>  After inquiring about the cause of the loss, Mr. Burd suggested "that we have a conference call with you[,] Katerina and others to make sure we are

28

all on the same page." Id.  A copy of the email went to Ms. Vatutina.

Defendants contend that the May 14 email "falls squarely with the crime-fraud exception." Id. at 3.  They assert that they have made the *prima facie* showing for the application of the crime-fraud exception; that intent to commit fraud is enough; communications which contain evidence of supplying false information and/or fabricating evidence fall within the crime-fraud exception; they need only show probable cause that the May 14 email establishes an intent to commit fraud; the Court may consider the May 14 email as evidence in determining whether the crime-fraud exception applies; *in camera* review is not required in order to apply the crime-fraud exception; and the exception applies even when an attorney is unaware of the fraudulent scheme.  Id. at 3-14.  Finally, Defendants argue that Felman should be required to produce all other attorney-client communications related to its fraudulent scheme.  Id. at 17.

Felman states that "the May 14 e-mail exchange evidences, at best, an **inquiry** regarding a contemplated fraud - not an attempted fraud.  Similarly, the May 14 e-mail exchange does not constitute an act in furtherance of a fraud." (# 326, at 2.)  It then argues that its evidence shows that Felman and its customers did not backdate sales contracts.  Id.  Felman contends that an inquiry concerning the legal effect of possible conduct is insufficient to

29

meet the standard of being a crime or fraud, even if the client had bad intentions. Id. at 13. It claims that Defendants have not shown any additional evidence that the writer of the email intended insurance fraud, id. at 14, and it argues that it is equally plausible that the question was innocent and not nefarious, id. at 16. That is, Felman suggests that the May 14 email was "a good faith inquiry regarding the appropriateness of contemplated conduct." Id. at 19. Finally, it contends that the issue of whether Felman could have sold all of the possible output from three furnaces is a disputed fact to be decided at trial. Id. at 21.

Defendants' Reply argues that the issue of whether Felman committed a fraud is not at hand; the question presented is whether "the May 14 email shows an **intent** to commit fraud." (# 328, at 1-2.) Defendants assert that their *prima facie* case is established by more evidence than the May 14 email. Id. at 4. They offer evidence that in the summer of 2008, the market was oversupplied with silicomanganese so that it is unlikely that Felman could have sold the production from all three of their furnaces. Id. at 5. Notwithstanding the over-saturation of the market, Defendants point to a letter from Felman's CEO to Defendants to the effect that Felman had commitments to purchase the output from all three furnaces. Id. at 6. Defendants have also provided a Felman memorandum which argues that if the Felman furnaces were shut down

as was being proposed, it would undermine their insurance claim. Id.  When Defendants requested business plans from Felman to show that Felman intended to produce silicomanganese from all three furnaces during 2008, they learned that the plans did not exist. Id. at 7.  They have provided a copy of a February, 2009 email from Katerina Vatutina instructing a Felman employee to "write [business plans for 2008 and earlier] right now."  Id.

Defendants further argue that a request for advice on how best to commit a fraud is not a privileged communication; they assert that the May 14 email shows Felman's intent and Mr. Dolzhykov's bad faith.  Id.

The Court has ruled that the attorney-client privilege which attached to the May 14 email was waived.  Because the May 14 email has not been adjudicated to be privileged, pursuant to Zolin and Madden, the Court can consider the May 14 email in determining whether Defendants have presented sufficient evidence to support a reasonable belief that in camera review may yield evidence that establishes the crime-fraud exception's applicability.

The Court finds that Defendants have presented sufficient evidence to support a reasonable belief that in camera review may yield evidence that establishes the crime-fraud exception's applicability.  The May 14 email strongly suggests that Mr. Dolzhykov had already attempted to obtain false back-dated documents to support Felman's insurance claim.  The additional

31

evidence described by Defendants supports their argument that Felman's proof of loss substantially over-states its business losses as a result of the transformer failure. Accordingly, the undersigned will engage in *in camera* review of documents as to which Felman has asserted privilege or protection to determine whether they fall within the crime-fraud exception.

### Rulings

It is hereby **ORDERED** that Defendants' motion to compel (# 283-1) is granted in part and denied in part as follows: Felman is directed, on or before June 4, 2010, to submit documents as to which it asserts privilege or protection, which are dated from the date of the loss through June 30, 2008, in chronological order, *in camera,* with a privilege log of those documents which complies with Fed. R. Civ. P. 26(b)(5)(A), including a description of the identities of persons whose names appear and definitions of terms as needed. The Court takes under advisement whether the crime-fraud exception applies to any of Felman's withheld documents. It is further **ORDERED** that Defendants' motion for protective order (# 283-2) is granted in that Defendants are not required to return the May 14 email. The Court does not have before it a motion related to the 377 documents listed on Felman's April 21 claw-back. If Felman believes that its production of the 377 documents presents materially different facts from those described in this Memorandum Opinion and Order relating to the production of the May 14 email,

then it should promptly file a motion; otherwise, the Court will assume that the ruling as to the May 14 email applies to the 377 documents.

The Clerk is directed to transmit this Memorandum Opinion and Order to all counsel of record.

ENTER: May 18, 2010

_Mary E. Stanley_
Mary E. Stanley
United States Magistrate Judge

33