UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON

MT. HAWLEY INSURANCE COMPANY,

      Intervenor Plaintiff,

v.

FELMAN PRODUCTION, INC.,

      Plaintiff,

v.                           Case No. 3:09-cv-00481

INDUSTRIAL RISK INSURERS,
WESTPORT INSURANCE COMPANY, and
SWISS REINSURANCE AMERICA CORPORATION,

      Defendants.

## MEMORANDUM OPINION AND ORDER

On August 11, 2010, the Court conducted a status conference and hearing on pending motions and other matters. Pending before the Court is Defendants' motion to compel plaintiff Felman Production, Inc. ("Felman") to produce documents from additional custodians (docket # 372). Felman has responded in opposition (# 385) and Defendants filed a reply (# 397).

Felman has previously produced to Defendants voluminous documents and electronically stored information ("ESI") to Defendants from various "custodians" of those documents and ESI. Now Defendants have identified ten individuals who, Defendants believe, "were intimately involved in the management of Felman's

business operations" and its insurance claim, and seek production of relevant documents and ESI from them.  (# 372, at 1.)  The ten individuals,[1] collectively referred to as "Privat representatives," are not employed by Felman.  Defendants contend that these ten people "managed and controlled Felman's business operations and communicated about issues critical to this case."  Id. at 3.  They argue that these ten individuals have documents which are within Felman's "possession, custody or control" for the purpose of Rule 34, Federal Rule of Civil Procedure.  Id. at 4.

Nine of the ten individuals presumably are Ukrainians who speak and write in Russian and reside in Ukraine.  They are affiliated with Ukrainian entities which allegedly own and control Felman, a wholly owned subsidiary.  Defendants rely on holdings in Uniden Am. Corp. v. Ericsson, Inc., 181 F.R.D. 302 (M.D.N.C. 1998), Steele Software Systems v. Dataquick, 237 F.R.D. 561 (D. Md. 2006), the unpublished Order in Appleton Papers Inc. v. George A. Whiting Paper Co., No. 2:08-cv-16, 2009 U.S. Dist. LEXIS 71322 (E.D. Wis. July 31, 2009) [not available on Westlaw], and the unpublished Order in General Electric Co. v. Latin American Imports, S.A., No.3:99-cv-92, 2002 U.S. Dist. LEXIS 15366 (W.D. Ky. July 12, 2002 (decided), July 16, 2002 (entered)) [not available on Westlaw].

Defendants cite examples of the Privat representatives'

---

[1] Katerina Vatutina, Sergiy Maximenko, Anastasiya Kuharuk, Gennadiy Bogolyubov, Igor Kolomoiskiy, Alexey Martynov, Victor Skiba, Mordechai Korf, Velvel Lozynskyy, and Robert Powell.

activities in connection with Felman and conclude that the Privat representatives had the authority to bind Felman and to direct Felman's actions, including quoting prices, signing contracts, issuing purchase orders, setting payment terms, selling scrap metal, and speaking to auditors. (# 372, at 20.) They assert that the Privat representatives were the agents of Felman because they managed the business in Felman's name. Id. Defendants contend that Felman thus has "control" over the documents and ESI of the Privat representatives. Id.

Felman's response argues that the requested additional production is unwarranted because the crux of this action is whether Defendants should pay Felman's property damage and business interruption insurance claims, arising at the West Virginia plant, not the intricacies of Felman's corporate structure. (# 385, at 2.) It contends that the additional discovery is cumulative, duplicative, overreaching, burdensome and expensive. Id. at 2, 14-19. Felman asserts that Defendants have already obtained responsive documents from three of the ten individuals. Id. at 5-8. It argues that Defendants have not established that Felman has the documents and ESI within its "control." Id. at 8-13.

Defendants' reply revisits its position that it has demonstrated through documents the extensive involvement of the Privat representatives in Felman's business operations. (# 387, at 1-5, 8-9.) They further argue that Felman has the ability to

3

obtain the documents.  Id. at 6.

Felman's corporate structure/ownership is peculiar.  At the hearing, counsel for Felman advised that Felman has no minutes of board of directors' meetings, because there is only one director (Marios Sarris) and "it is hard to have a meeting with yourself." According to the docket sheet (# 83), Felman is 100% owned by Haftseek Investments Limited which, according to Defendants, is 100% owned by Divot Enterprises, Ltd., the stock of which is 100% owned by Igor Kolomoiskiy.  (# 372-1 at 3 n.xi.)  Mr. Kolomoiskiy is a "Privat representative" but Mr. Sarris is not.

Other documents offered by Defendants indicate that Felman's Chief Executive Officer, Steven Pragnell, reported to Sergiy Maximenko of Privat Intertrading, and Gennadiy Bogolyubov of Privat Bank.  (# 372, Ex. A.)  Katerina Vatutina of Privat Intertrading worked extensively on Felman matters and paid the legal bills of Marks & Sokolov for their services with respect to the adjustment of Felman's insurance claim prior to the filing of this litigation. Id.

Felman has, for the most part, declined to produce documents relating to Privat Intertrading, Privat Bank and the Privat representatives.

By Order entered May 18, 2010 (# 334), the Court addressed an attorney-client privilege issue with respect to Ms. Vatutina's role as follows:

Felman argues that Mr. Burd was not authorized to waive the privilege by disclosing the May 14 email to Ms. Vatutina, and that Mr. Burd considered Ms. Vatutina to be an insider, not a third party. (# 323, at 8.) Felman submits affidavits from Mr. Burd and Ms. Vatutina in support of these contentions. Id., Exs. E and F.

Mr. Burd's affidavit states that, as outside corporate counsel for Felman, he knows that in 2007 and 2008, Felman was managed by Privat Intertrading, which oversaw Felman's operations, including sales of Felman's silicomanganese product. Id., Ex. E, ¶ 3, at 1.

5. In 2008, I routinely copied Ms. Vatutina on e-mails regarding Felman and its operations. I did so because (a) at that time, Ms. Vatutina on behalf of Privat was charged with overseeing Felman's operations and (b) in light of her supervisory role, I deemed her to be an essential participant in privileged communications regarding Felman and its operations. I certainly did not consider her to be a third party or outsider such that including her in a Felman attorney-client privileged communication might waive Felman's attorney-client privilege. Moreover, Felman has never consented to waiving the attorney-client privilege as to its communications with me. Id., ¶ 5, at 2.

Ms. Vatutina's affidavit states that in 2008, she worked for Privat Trading, which had a consulting services agreement with Feral, Ltd., which in turn had a consulting services agreement with Felman. Id., Ex. F, ¶ 2, at 1; # 329, Ex. H, ¶ 2, at 1. She indicates that she "further[ed] this consulting relationship by working exclusively on Felman-related matters [and] . . . communicated in 2008 with Felman's attorneys at Marks & Sokolov regarding various Felman-related matters." Id., ¶¶ 3-4. Felman did not submit an affidavit from any of its executives regarding Ms. Vatutina's role.

Defendants complain that "Felman's positions regarding Katerina Vatutina are inconsistent with the positions it has taken thus far in discovery." (# 325, at 14.) They advise that in verified discovery responses, Felman stated that "'there are no individuals from the Privat Group that have first-hand knowledge of any facts pertaining to Felman's Claim.'" Id. at 15 [citation to Felman's discovery responses not provided]. Defendants also assert that Ms. Vatutina's affidavit is

ambiguous, noting that Privat's consulting agreement with Felman was not provided.  Id.  They point out the absence of any sworn statement by a Felman executive regarding her role.  Finally, Defendants argue that Mr. Burd "was acting with Felman's permission when he forwarded the May 14 email to Ms. Vatutina."  Id. at 16.

The Court relies on Mr. Burd's and Ms. Vatutina's affidavits, and finds that Ms. Vatutina, as a consultant, acted on behalf of Felman and was within the scope of the privilege.  See In re Copper Market Antitrust Litig., 200 F.R.D. 213, 219-20 (S.D.N.Y. 2001) (privilege extended to public relations firm advising the company and consulting with its attorneys on litigated matters); McCaugherty v. Siffermann, 132 F.R.D. 234, 239 (N.D. Cal. 1990) (no principled basis for distinguishing consultant's communications with attorneys and corporate employee's communications with attorneys).  Accordingly, the court finds that Mr. Burd did not purportedly waive the privilege by including Ms. Vatutina in his reply to the May 14 email.

(Order entered May 18, 2010, # 334, at 16-18.)

At the status conference on June 30, 2010, counsel engaged in extensive argument concerning this issue.  (Tr. # 364, at 1-30.) Counsel for Felman agreed to request that Ms. Vatutina and Mr. Maximenko produce documents relating to Felman's insurance claim, with the understanding that Felman could not certify the production.  Id. at 28-29.  At the status conference on August 11, 2010, counsel for Felman advised that the produced documents were reviewed for privilege by Marks & Sokolov.  That firm prepared a privilege log and produced non-privileged documents to Venable, who promptly forward them to Defendants' counsel.

Defendants have done a commendable job of extracting information from Felman's documents and filings which reflect the

6

Privat representatives' roles with respect to Felman's operations.
Defendants have provided numerous exhibits in support of their
motion, which establish the involvement of the Privat
representatives in Felman's operations. (# 372.) With respect to
each of the Privat representatives, the undersigned has set forth
below excerpts from the exhibits and references.

<u>Katerina Vatutina</u>
        Project Manager, US Ferroalloys Project, Privat Intertrading.

        "Ms. Vatutina - although not technically a Felman employee -
        was acting as a consultant to Felman at the time of this [May
        14] email and was performing a decision-making, management
        role with respect to the operation of Felman's plant. As
        such, she was for all intents and purposes part of Felman and
        was an essential participant in certain Felman communications
        and decisions, including the matters discussed in outside
        counsel's response to the May 14, 2008 e-mail." (Felman's
        Response in Opposition to Defendants' Motion to Compel and for
        Protective Order, # 314, at 9.)

        "I [Katerina Vatutina] am an employee of Privat Intertrading
        ('Privat'). In 2008, Privat had a consulting services
        agreement with Feral Ltd., which in turn had a consulting
        services agreement with Felman Production, Inc. ('Felman').
        Through this consulting relationship, Privat oversaw and
        advised Felman with respect to sales, budgeting, production
        and daily operations. My role in 2008 as a Privat employee
        was to further this consulting relationship by working
        exclusively on Felman-related matters. By way of example, I
        negotiated the 2008 Glencore Agency Agreement on behalf of
        Felman. in this same capacity, I also communicated in 2008
        with Felman's attorneys at Marks & Sokolov regarding various
        Felman-related matters." (Affidavit of Katerina Vatutina, #
        323-6, at 1; # 372-3, at 80.)

        On November 21, 2007, Mr. Victor Skiba instructed Ms. Vatutina
        to "[l]et the management of Felman tell [Felman's accountants]
        that, according to the information they have, the final owner
        of the company Divot is IVK [Igor Kolomoiskiy], a citizen of
        Ukraine." (# 372-3, at 32-33.)

        On February 11, 2008, a Glencore representative wrote that

Felman's pricing would be reviewed with Ms. Vatutina.  (# 377, at 87.)

On February 26, 2008, a representative of Glencore wrote to Ms. Vatutina and Ms. Maximenko concerning a meeting of Glencore, Privat and Privat's "USA representatives."  (# 377, at 68.)

On April 1, 2008, Ms. Vatutina wrote to a Glencore representative on behalf of herself and Mr. Maximenko, regarding the sale of Felman's production in 2008, without copying West Virginia Felman executives.  (# 377, at 78.)

On May 26, 2008, Ms. Vatutina instructed Felman CEO Pragnell to report to Mr. Bogolyubov (the "Shareholder") through Mr. Maximenko and to provide "more detailed info for Shareholder's attention."  (# 372-4, at 32.)

On July 21, 2008, Mr. Pragnell confirmed in an email to Mr. Vatutina, copied to Messrs. Maximenko and Bogolyubov, that he works for Mr. Bogolyubov.  (# 372-3, at 9.)

On August 25, 2008, a Glencore representative wrote that Mr. Vatutina and Mr. Maximenko had confirmed a price.  (# 377, at 90.)

On October 9, 2008, Mr. Vatutina wrote an email to a Glencore representative that she "was authorized by Mr. Martynov to inform you that in case we will not have a signed copy of 2 agency agreements . . . as well as making payment for the 5000mt freight, . . . then all previous verbal agreements are to be considered as void."  (# 377, at 74.)

On November 12, 2008, Ms. Vatutina wrote an email to Mr. Pragnell, marked of "High" importance, complaining that daily production reports generated by Felman (reviewed by her assistant, Anastasia Kuharuk) contain a lot of mistakes, noting that the mistakes make it "really difficult for us to make an accurate report[] for the Shareholders."  (# 372-3, at 82.)

A series of emails dated December 2, 2008, indicate that Ms. Vatutina informed Glencore representatives and Vladyslav Mikheyev of Felman Trading that a Felman decision regarding the honoring of contracts "was made by our Shareholders."  (# 377, at 12-15.)

When informed that the insurance company had requested

8

business plans to verify when Felman planned to start up
furnace No. 2, and that Felman's Chief Financial Officer could
not find any business plans, Ms. Vatutina instructed him to
"write them up right now [February 27, 2009]." (# 372-3, at
6.)

Sergiy Maximenko (Sergey Maksimenko)
        Head of the Ferroalloys Department of Privat Intertrading.

On February 26, 2008, a representative of Glencore wrote to
Ms. Vatutina and Ms. Maximenko concerning a meeting of
Glencore, Privat and Privat's "USA representatives." (# 377,
at 68.)

On April 1, 2008, Ms. Vatutina wrote to a Glencore
representative on behalf of herself and Mr. Maximenko,
regarding the sale of Felman's production in 2008, without
copying West Virginia Felman executives. (# 377, at 78.)

On May 26, 2008, Ms. Vatutina instructed Felman CEO Pragnell
to report to Mr. Bogolyubov (the "Shareholder") through Mr.
Maximenko and to provide "more detailed info for Shareholder's
attention." (# 372-4, at 32.)

On June 13, 2008, Felman CEO Pragnell wrote a memorandum to
Messrs. Maximenko and Bogolyubov, reporting on management and
requesting approval for engineering specialists, working on 30
day invoicing, quarterly budgets and a safety/environmental
officer. (# 372-4, at 76-79.)

On July 7, 2008, Mr. Maximenko wrote a memorandum to Mr.
Bogolyubov, concerning the possibility of building new
facilities in West Virginia, noting that a precondition is the
availability of the Felman plan for production of
silicomanganese. (# 372-4, at 3.)

On July 21, 2008, Mr. Pragnell confirmed in an email to Mr.
Vatutina, copied to Messrs. Maximenko and Bogolyubov, that he
works for Mr. Bogolyubov. (# 372-3, at 9.)

In August, 2008, Mr. Maximenko visited the Felman plant. (#
372-4, at 34.)

On August 25, 2008, a Glencore representative wrote that Mr.
Vatutina and Mr. Maximenko had confirmed a price. (# 377, at
90.)

On September 10, 2008, Felman's CEO, Mr. Pragnell,

communicated with Mr. Maximenko and Mr. Bogolyubov regarding advice from counsel and the status of Felman's insurance claim. (# 372-4, at 15, ID # 3953.)

On October 22, 2008, six months after the transformer failure, Felman CEO Pragnell wrote a memorandum to Mr. Maximenko regarding the possible shutdown of Felman, noting the importance of the "Shareholders" and their ability to require a shutdown. (# 372-3, at 12.)  The memorandum notes that the Privat Shareholders would suffer a loss of $3 million if the plant were shut down, compared to its remaining in operation. Id.

On November 12, 2008, Mr. Maximenko expressed his dissatisfaction with the performance of the Commercial Director of Felman and requested additional information. (# 372-4, at 52.)

In May 19, 2009 emails, Glencore representatives discuss Felman's pricing, which used to be approved by Mr. Maximenko but is now approved by Mr. Korf. (# 382, at 17.)

Anastasiya (Anastasia) Kuharuk (Kukharuk)
    Assistant to Katerina Vatutina, Privat Intertrading.

In emails dated July 8, 2008, Felman CEO Pragnell asks permission for 30 day invoicing on the sale of scrap metal. (# 372-4, at 81.)

In e-mails dated August 7, 2008, between Steven Pragnell and Anastasiya Kuharuk, with copies to Katerina Vatutina and Sergiy Maximenko, Mr. Pragnell is informed that Felman, as an operational unit of Privat Group, is subject "to controlling by the Group's Tender Committee which examines ALL the purchase positions of the plants, including even services." Mr. Pragnell acknowledges that "all decisions regarding the distribution of money and expenditure will be undertaken in the Ukraine." (# 372-3, at 49-52.)

Gennadiy Bogolyubov
    One of three shareholders of Privat Bank.

On May 26, 2008, Ms. Vatutina instructed Felman CEO Pragnell to report to Mr. Bogolyubov (the "Shareholder") through Mr. Maximenko and to provide "more detailed info for Shareholder's attention." (# 372-4, at 32.)

On June 13, 2008, Felman CEO Pragnell wrote a memorandum to

10

Messrs. Maximenko and Bogolyubov, reporting on management and requesting approval for engineering specialists, 30 day invoicing, quarterly budgets and a safety/environmental officer. (# 372-4, at 76-79.)

On July 7, 2008, Mr. Maximenko wrote a memorandum to Mr. Bogolyubov, concerning the possibility of building new facilities in West Virginia, noting that a precondition is the availability of the Felman plan for production of silicomanganese. (# 372-4, at 3.)

On July 21, 2008, Mr. Pragnell confirmed in an email to Mr. Vatutina, copied to Messrs. Maximenko and Bogolyubov, that he works for Mr. Bogolyubov. (# 372-3, at 9.)

On September 10, 2008, Felman's CEO, Mr. Pragnell, communicated with Mr. Maximenko and Mr. Bogolyubov regarding advice from counsel and the status of Felman's insurance claim. (# 372-4, at 15, ID # 3953.)

Igor Kolomoiskiy (Kolomoisky)
     100% owner of Divot Enterprises, Ltd. (West Indies), which owns 100% of Haftseek Investments Ltd. (Cyprus), which owns 100% of Felman Production, Inc.; one of three shareholders of Privat Bank.

     This information regarding the ownership of Felman was provided in late 2007 to Felman's accounting firm, Suttle & Stalnaker of Charleston, WV, at the direction of Victor Skiba and Katerina Vatutina. (# 372-3, at 32-44.)

     On or about March 23, 2009, according to a representative of Glencore, Mr. Kolomoiskiy hired Mordecai Korf to head Felman Trading. (# 382, at 3 [sealed].)

Alexey Martynov (Martinov)
     One of three Shareholders of Privat Bank.

     A September 29, 2008 email between Felman and Glencore indicates that "the main terms [of Gencore's agency agreement with Felman] were agreed months ago with Mr. Martinov." (# 382, at 8 [sealed].

     On October 9, 2008, Mr. Vatutina wrote an email to a Glencore representative that she "was authorized by Mr. Martynov to inform you that in case we will not have a signed copy of 2 agency agreements . . . as well as making payment for the 5000mt freight, . . . then all previous verbal agreements are

to be considered as void." (# 377, at 74.)

Victor Skiba
      Privat Bank.

      On September 11, 2006, Victor Skiba provided an affidavit in
      Felman Production, Inc. v. Bannai, No. 3:06-cv-0644 (S.D. W.
      Va.), in which he described himself as "head of the project
      management department for the Investment Business Department
      of PrivatBank, a financial institution organized under the
      laws of Ukraine." (# 372-4, at 40.)   He stated that his
      "responsibilities include advising Felman Production, Inc. .
      . .." Id.

      On November 21, 2007, Mr. Skiba instructed Ms. Vatutina to
      "[l]et the management of Felman tell [Felman's accountants]
      that, according to the information they have, the final owner
      of the company Divot is IVK [Igor Kolomoiskiy], a citizen of
      Ukraine." (# 372-3, at 32-33.)

Mordechai (Motti) Korf
      President, Warren Steel Holdings/Optima International.

      In early 2009, Mr. Korf, as President of Warren Steel
      Holdings, and Velvel Lozynskyy, Shareholders' Representative,
      authorized payment of an invoice for repair of Felman's
      transformer. (# 372-3, at 84.)

      On March 13, 2009, Robert Powell wrote to Mr. Korf regarding
      strategy in the insurance claim negotiations. (# 372-4, at
      16, ID # 3308.)

      On March 19, 2009, Mr. Powell and Mr. Korf had a series of
      communications regarding Felman's insurance coverage claim.
      (# 372-4, at 17-18, ID ## 3338, 3339, 3341, 3343.)

      On or about March 23, 2009, Mr. Korf became head of Felman
      Trading. (# 382, at 3 [sealed].)

      On March 24, 2009, Mr. Powell wrote to Mr. Korf concerning
      projected litigation expenses relating to Felman's insurance
      claim. (# 372-4, at 19, ID # 3426.)

      On March 31, 2009, Mr. Powell wrote an email to the "Felman
      Team" instructing them that "no contracts/agreements can be
      signed or agreed to on Felman's behalf without the approval of
      Motti, Velvel or myself.  Specifically, all Purchase Orders
      need to be approved by Velvel before going out.  I need to

12

review all other contracts/agreements." (# 372-4, at 73.)

On April 13, 2009, Mr. Powell wrote to Mr. Korf concerning strategy for Felman's insurance coverage dispute. (# 372-4, at 20, ID # 3528.)

On April 17, 2009, Mr. Powell wrote memoranda to Mr. Korf regarding facts of the transformer insurance claim. (# 372-4, at 21, ID ## 0348-49.)

On April 22, 2009, Mr. Korf wrote to Mr. Powell regarding strategy relating to Felman's insurance coverage. (# 372-4, at 22, ID # 3559.)

On April 30 and May 1, 2009, Mr. Powell and Mr. Korf communicated regarding the complaint against the insurance companies. (# 372-4, at 23-24, ID ## 3591, 3596, 3600, 3607, 3615.)

In May 19, 2009 emails, Glencore representatives discuss Felman's pricing, which used to be approved by Mr. Maximenko but is now approved by Mr. Korf. (# 382, at 17.)

On September 1, 2009, Mr. Korf expressed his extreme displeasure at a situation, commenting that "[t]his will NEVER happen again in a[n] organization that I run." (# 372-4, at 29.) A copy was provided to Velvel Lozynskyy.

On May 17, 2010, Mr. Korf signed a complaint with the West Virginia Insurance Commissioner against Defendants for their conduct during the adjustment of Felman's insurance claim. Such a complaint must be signed by an "officer" of Felman. (# 372-3, at 75.)

Velvel Lozynskyy
    Shareholders Representative

In early 2009, Mr. Korf, as President of Warren Steel Holdings, and Velvel Lozynskyy, Shareholders' Representative, authorized payment of an invoice for repair of Felman's transformer. (# 372-3, at 84.)

On March 31, 2009, Mr. Powell wrote an email to the "Felman Team" instructing them that "no contracts/agreements can be signed or agreed to on Felman's behalf without the approval of Motti, Velvel or myself. Specifically, all Purchase Orders need to be approved by Velvel before going out. I need to review all other contracts/agreements." (# 372-4, at 73.)

For May, 2009, the Human Resources Manager of Felman, Denys Dolzhykov, requested Mr. Lozynskyy's approval to transfer $22,000 from Felman's account to Privat Bank's account for payment of salaries to Felman's foreign (presumably Ukrainian) employees, including Mr. Kolzhyov, the Chief of planning-production department, the sales manager, the Commercial Director (consultant), the Plant Manager (consultant) and the Chief of Repair Service.  (# 372-4, at 6.)

On September 1, 2009, Mr. Korf expressed his extreme displeasure at a situation, commenting that "[t]his will NEVER happen again in a[n] organization that I run."  (# 372-4, at 29.)  A copy was provided to Velvel Lozynskyy.

Robert L. Powell, Jr.
General counsel for Warren Steel, Optima, Felman, and Felman Trading.

On March 13, 2009, Robert Powell wrote to Mr. Korf regarding strategy in Felman's insurance claim negotiations.  (# 372-4, at 16, ID # 3308.

On March 19, 2009, Mr. Powell and Mr. Korf had a series of communications regarding Felman's insurance coverage claim.  (# 372-4, at 17-18, ID ## 3338, 3339, 3341, 3343.)

On March 24, 2009, Mr. Powell wrote to Mr. Korf concerning projected litigation expenses relating to Felman's insurance claim.  (# 372-4, at 19, ID # 3426.)

On March 31, 2009, Mr. Powell wrote an email to the "Felman Team" instructing them that "no contracts/agreements can be signed or agreed to on Felman's behalf without the approval of Motti, Velvel or myself.  Specifically, all Purchase Orders need to be approved by Velvel before going out.  I need to review all other contracts/agreements."  (# 372-4, at 73.)

On April 13, 2009, Mr. Powell wrote to Mr. Korf concerning strategy for Felman's insurance coverage dispute.  (# 372-4, at 20, ID # 3528.)

On April 17, 2009, Mr. Powell wrote memoranda to Mr. Korf regarding facts of the transformer insurance claim.  (# 372-4, at 21, ID ## 0348-49.)

On April 22, 2009, Mr. Korf wrote to Mr. Powell regarding strategy relating to Felman's insurance coverage.  (# 372-4, at 22, ID # 3559.)

On April 30 and May 1, 2009, Mr. Powell and Mr. Korf communicated regarding the complaint against the insurance companies. (# 372-4, at 23-24, ID ## 3591, 3596, 3600, 3607, 3615.)

Relevancy

Based on the extensive exhibits submitted by Defendants (which are not countered by Felman), the Court finds that nine of the ten Privat representatives (excluding Victor Skiba) are custodians of documents which are relevant to the claims and defenses of the parties in this action. The Court excludes Mr. Skiba because the most recent exhibit relating to him is dated November 21, 2007, approximately five months before the transformer failed. Henceforth the phrase "Privat representatives" will be deemed to exclude Mr. Skiba. If the Privat representatives were employed by Felman, there is no question that their non-privileged documents would be discoverable and highly relevant. The exhibits establish that direct control over Felman's operations was exercised by the Privat representatives, particularly Ms. Vatutina (with the assistance of Ms. Kuharuk) and Messrs. Maximenko and Bogolyubov in 2008, succeeded by Messrs. Korf and Lozynskyy in 2009, advised by Mr. Powell. It appears that these individuals answered to Messrs. Kolomoiskiy and Martynov. The Privat representatives were intimately involved in decisions regarding sales and pricing of Felman's production, thereby directly affecting Felman's business interruption claim and net profits; Messrs. Korf and Powell are significantly involved in this insurance litigation. After review

15

of these exhibits, it is troubling indeed that Defendants advise that in verified discovery responses, Felman has stated that "there are no individuals from the Privat Group that have first-hand knowledge of any facts pertaining to Felman's Claim." (# 325, at 15) [citation to Felman's discovery responses not provided].

"Control"

Rule 34 applies to items "in the responding party's possession, custody, or control." Numerous courts have addressed the concept of "control" as between corporate entities; virtually all of the published decisions have required production by the nonparty corporation.

As early as 1958, the Supreme Court ruled that Rule 34's requirement of "possession, custody, or control" had been satisfied upon a *prima facie* showing that two corporations "were substantially identical." Societe Internationale pour Participations Industrielles et Commerciales, S.A. v. Rogers, 357 U.S. 197, 200 (1958). The Court wrote that a finding of lack of "control" would "invite efforts to place ownership of American assets in persons or firms whose sovereign assures secrecy of records." Id. at 205.

In Cooper Industries, Inc. v. British Aerospace, Inc., 102 F.R.D. 918, 919-20 (S.D.N.Y. 1984), the court remarked that "it is inconceivable that defendant would not have access to these documents and the ability to obtain them for its usual business.

16

Defendant has submitted nothing more than conclusory statements to show that these documents are not in its custody or control."  The plaintiff's motion was granted and the defendant was given three weeks to produce the documents, after which a fine of $500 per day would be assessed.  Id. at 920.

In M.L.C., Inc. v. North American Philips Corp., 109 F.R.D. 134, 136 (S.D.N.Y. 1986), relating to a fourth motion for sanctions in an antitrust action, the court commented that the term "control" is broadly construed.

In Afros S.P.A. v. Krauss-Maffei Corp., 113 F.R.D. 127, 129 (D. Del. 1986), the court noted that "[t]he fact that a court cannot exercise jurisdiction over a person does not necessarily mean documents in that person's possession are shielded from the reach of Rule 34, which applies only to parties to the litigation."

> [T]he key factual issues in determining control [are]: the parent's ownership share in the subsidiary or affiliated corporation; whether the corporations had interlocking management structures; the degree of control exercised by the parent over the subsidiary's directors, officers, and employees.

Id. (citing In re Uranium Antitrust Litigation, 480 F. Supp. 1138, 1151-53 (N.D. Ill. 1979)).

> The "nature of the relationship" between the party over whom the court has jurisdiction and the non-party with possession of the documents will determine whether a motion to compel discovery should be granted.  Three factors are of paramount importance in ascertaining this relationship: first, the corporate structure encompassing the different parties; second, the non-party's connection to the transaction at issue; third, to what degree will the non-party receive the benefit of any award in the

17

case.

Id. at 130.  The court compelled production of the documents.  Id. at 132.

In Camden Iron and Metal, Inc. v. Marubeni America Corp., 138 F.R.D. 438 (D.N.J. 1991), the plaintiff sought documents from the defendant's foreign parent corporation.  Noting that the word "control" is very broadly construed, id. at 441, the court both relied on and distinguished Gerling Intern. Ins. Co. v. C.I.R., 839 F.2d 131 (3d Cir. 1988).

> Hence, in parent/subsidiary situations, the determination of control turns upon whether the intracorporate relationship establishes some legal right, authority *or* ability to obtain the requested documents on demand.  Evidence considered by the courts includes the degree of ownership and control exercised by the parent over the subsidiary, a showing that the two entities operated as one, demonstrated access to documents in the ordinary course of business, and an agency relationship.

138 F.R.D. at 442 (citing Gerling, 839 F.2d at 140-41).  The motion for production of the documents was granted.  Id. at 444.

In Addamax Corp. v. Open Software Foundation, Inc., 148 F.R.D. 462 (D. Mass. 1993), the court addressed a subpoena issued to a nonparty subsidiary, seeking production of documents in the possession of its parent corporation.  Rule 45(a)(1)(A)(iii) uses the same phrase as Rule 34(a)(1): "possession, custody, or control."  The court wrote that

> it is the nature of the transactional relationship between the subsidiary and parent that is pivotal.  The court must examine the facts of the case before it in order to determine if the relationship is such that

18

production of documents is to be compelled.
148 F.R.D. at 467.  The magistrate judge concluded that the party
seeking enforcement of the subpoena had made a *prima facie* case
that the two corporations acted as one, particularly noting that
the parent exercised the power to terminate and appoint members of
the subsidiary's board.  Id.  The subpoena was enforced.  Id. at
469.

In Japan Halon Co., Ltd. v. Great Lakes Chemical Corp., 155
F.R.D. 626, 627 (N.D. Ind. 1993), the plaintiff resisted a request
for production of documents from its parent corporations because
Japanese law provides that a subsidiary has no right to demand
documents from its parent.  The court reviewed deposition testimony
that evidenced "extreme closeness" of the subsidiary and its parent
corporations.  Id. at 628.  The court was highly critical of the
plaintiff's resistance, describing their argument as
"hypertechnical" and "obstructionist."  Id.  The court wrote that
"a Japanese corporation has invoked th[e] jurisdiction of this
court and therefore is subject to the appropriate laws that apply
here."  Id. at 629.  The motion to compel was granted and the judge
warned that engaging "in a species of international hide and seek"
was unwise and could become very expensive, in light of the
sanctions available under Rules 11, 16 and 37.  Id.

In Uniden America Corp. v. Ericsson, Inc., 181 F.R.D. 302, 306
(M.D.N.C. 1998), the magistrate judge reviewed the factors which

19

help to determine when documents in the possession of one corporation may be deemed to be under the control of another corporation.

> They include (a) commonality of ownership, (b) exchange or intermingling of directors, officers or employees of the two corporations, (c) exchange of documents between the corporations in the ordinary course of business, (d) any benefit or involvement by the non-party corporation in the transaction, and (e) involvement of the non-party in the litigation.

> For example, subsidiary corporations which are wholly owned by the parent have no right to order the parent corporation to turn over documents. However, because of the ownership situation, there often exists some intermingling of directors, officers, or employees, or business relations. Consequently, the subsidiary may be required to respond to a Rule 34 request which includes the parent company's documents.

Id. (citations omitted). The magistrate judge found that the parent corporation exerted control over sister corporations, as opposed to their being run as completely separate, independent entities, and granted the motion to compel. Id. at 307-08.

In Steele Software Systems Corp. v. Dataquick Information Systems, Inc., 237 F.R.D. 561 (D. Md. 2006), Magistrate Judge Grimm considered the issue of "control" over documents in the context of the collection of a judgment. The court noted that the entities had common ownership, were closely related, and were located in the same place. Id. at 566. The motion to compel was granted. Id.

The Court finds that the application of the factors to the facts contained in the exhibits submitted by Defendants compels a conclusion that Felman has "control" over documents in the custody

20

of the Privat representatives.  The corporate formalities normally associated with an independent corporation are utterly lacking with respect to Felman.   It does not have a functioning board of directors.   Chief Executive Officer Pragnell was "in charge" of Felman Production in name only; the exhibits demonstrate that he was not authorized to decide whether he could increase employment or to sell scrap metal which was taking up needed space.   He apparently did not participate in negotiating the agency agreement with Glencore or in setting the price for the plant's production. He was not permitted to communicate directly with Mr. Bogolyubov, but only through Ms. Vatutina and Mr. Maximenko.   The Privat representatives were responsible for making decisions on the distribution of money and expenditures.   They received periodic updates on the status of the insurance claim and this action.  As the ultimate and 100% owner of Felman, Mr. Kolomoiskiy stands to gain if Felman prevails in this action.  After thorough review of the exhibits, the undersigned is persuaded that the Privat representatives operate Felman Production, Inc. as if it is their sole proprietorship; Felman has little independence.

Documents Already Produced

Felman raises the points that Defendants have not filed a proper motion to compel and that it is not clear what Defendants request.  (# 385, at 5.)  It notes that it has previously produced documents from Robert Powell, Felman's general counsel, Katerina

21

Vatutina and Sergiy Maximenko.  <u>Id.</u> at 6-7 n.4.  Felman contends
that the mere fact that an individual sent or received
communications regarding Felman's operations does not prove that
the individual has relevant information on the insurance claim.
<u>Id.</u> at 7.

    The Court has always understood Defendants' motion to assert
that the documents and ESI which Felman belatedly produced in
January, 2010 should have included material from the Privat
representatives.  Thus, it was not necessary for Defendants to
serve a separate Rule 34 request for production, and the pending
motion to compel is proper and appropriate.  Up to this point, it
was not required that the Vatutina and Maximenko documents produced
by Felman be accompanied by a certification of compliance with Rule
34.  It is not clear to the undersigned whether Ms. Vatutina's and
Mr. Maximenko's ESI was previously produced.  The fact that some
documents have been produced is not a persuasive reason for denying
the motion to compel.  The evidence does not support Felman's
assertion that "the only potential custodian that IRI identifies .
. . that had any active role in Felman's operations is Katerina
Vatutina."  (Felman's Opposition, # 385, at 8.)  Thus Felman's
first argument in opposition is not persuasive.

<u>Evidence of "Control"</u>

    Felman is correct that Defendants bear the burden of proof on
the issue of whether Felman has "control" over the documents and

ESI sought.  Steele Software, 237 F.R.D. at 565 (citing Cotracom Commodity Trading Co. v. Seaboard Corp., 189 F.R.D. 655, 663 (D. Kan. 1999)).  Felman argues that Defendants have offered few facts in support of their motion ("The only specific fact to which IRI points to establish a corporate link between Felman and . . . the 'Privat entities' is that '[o]ne of the three shareholders of Privat Bank is the sole owner of Felman and Felman Trading.')." (# 385, at 9.)  Felman notes that only Victor Skiba is an employee of Privat Bank.  Id.  Otherwise, Felman argues that the Defendants' facts are hearsay and confusion.  Id. at 9-11.  It asserts that the facts "fall well short of establishing the type of corporate affiliation necessary to deem Felman to possess or control Privat Intertrading's or Privat Bank's documents in Ukraine."  Id. at 11.

The issue here is not whether Privat Bank or Privat Intertrading is an appropriate custodian - the focus is on the individuals who were exercising supervision and control over Felman's operations.  The Court finds that Defendants have provided abundant evidence that the Privat representatives are closely related to Felman (through a variety of entities and arrangements) and are custodians of documents and ESI relating to Felman and the parties' claims and defenses.

Cumulative or duplicative

Felman contends that Defendants have failed to establish that production of documents and ESI from the Privat representatives

will result in "new or different facts material to this case." (#
385, at 14.)  In particular, Felman asserts that Velvel Lozynskyy's
alleged involvement adds little to the investigation of the facts;
that Alexey Martynov's participation in the negotiation of the
Glencore agency agreement has been extensively explored; and that
Gennadiy Bogolyubov has not been shown to have significant
knowledge.  Id. at 15-16.  In sum, Felman contends that Defendants
are taking discovery to unreasonable lengths.  Id. at 16.

In their reply, Defendants point out that "Felman has **never
denied** that the additional custodians at issue have relevant and
responsive documents." (# 387, at 2 (emphasis in the original).)
They provide lists of business decisions in which the Privat
representatives participated and topics of communication among
them.  Id. at 2-4.

The Court finds that the requested production of documents and
ESI from the Privat representatives is not unreasonably cumulative
or duplicative.  In the Spring of 2009 (during the adjustment of
the insurance claim and leading to the filing of this action),
Velvel Lozynskyy was one of three individuals (along with Messrs.
Korf and Powell) with absolute authority over all Felman
contracts/agreements and purchase orders.  (#372-4, at 73.)  Mr.
Martynov (and not the Felman CEO) negotiated the main terms of the
Glencore agency agreement with Felman, which document appears to be
an important piece of evidence in this action.  (# 382, at 8

24

[sealed].)  Mr. Bogolyubov was the Shareholder of Privat Bank with the most direct connection with CEO Pragnell (through Mr. Maximenko).   While it is highly likely that the Privat representatives will produce documents and ESI which are duplicates of previously produced materials, it is reasonable to believe that they will have additional, highly relevant materials concerning Felman and its insurance claim, which were not shared with Felman executives.

Burden, Expense, Cost, Delay

Felman argues that the process of gathering and producing documents and ESI (assuming that Ukrainian law is no barrier) from the Privat representatives will be burdensome, expensive and time-consuming.  (# 385, at 17.)  It contends that the likely benefit is outweighed by the burden.   Id.

Defendants' reply asserts that Felman's claim of undue burden is insufficient, lacking any detailed explanation or affidavit.  (# 387, at 10.)

The Court is mindful that the granting of Defendants' motion will impose some burden on Felman and the Privat representatives; however, the Court has concluded that the likely benefit outweighs the burden and is justifiable.   The exhibits submitted by Defendants establish that the Privat representatives have been "calling the shots" at Felman since their acquisition of the business without the observance of the normal corporate

25

formalities.    The  exhibits  indicate  that  it  is  one  or  two shareholders  and  their  designees  who  are  making  the  critical decisions  at  Felman  from  the  Ukraine.    As  such,  they  have  placed themselves  as  major  players  in  this  litigation.

It  is  hereby  **ORDERED** that  Defendants'  motion  to  compel  (# 372) is  granted  except  as  to  Victor  Skiba;  by  **September 10, 2010,** Felman shall  produce  to  counsel  for  Defendants  all  relevant,  nonprivileged documents  and  ESI  in  the  custody  of  the  nine  Privat representatives.    The  Court  does  not  require  that  the  documents  be translated.    During  a  telephone  conference  call  with  counsel  on August  13,  2010,  the  Court  directed  counsel  for  Felman  to  start  the process  of  gathering  the  documents  and  ESI  promptly.

The  parties  will  bear  their  own  costs.

The  Clerk  is  directed  to  transmit  this  Memorandum  Opinion  and Order  to  all  counsel  of  record.

ENTER:  August  19,  2010

Mary E. Stanley
United States Magistrate Judge

26