IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

FELMAN PRODUCTION, INC.,
a Delaware corporation,

       Plaintiff,

v.             CIVIL ACTION NO. 3:09-0481

INDUSTRIAL RISK INSURERS,
an unincorporated association, et al.,

       Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendants Industrial Risk Insurers and its member insurance agencies' (hereinafter "Defendants") Motion for Partial Summary Judgment–No Actual Loss Sustained (Doc. #**559**). For the reasons stated below, the motion is **GRANTED**.

**I.
Background**

Plaintiff Felman Production Inc., ("Plaintiff") produces silicomanganese ("SiMn"), an alloy used in steel production, at a plant in New Haven, West Virginia. Plaintiff began production at the plant, with two furnaces, in late 2006. Felman Production was established by a Ukranian investor group, PrivatIntertrading ("Privat"), and sold its product through an exclusive contract with a commodities broker, Glencore Ltd.

In March 2008, Plaintiff purchased a business interruption insurance policy (hereinafter "policy") from Defendants for the period of February 23, 2008 to February 23, 2009. (Pl. Ex. 1,

Policy IRI0002.003679-780). The policy covered up to $25 million dollars worth of property damage and business interruption losses resulting from, among other things, equipment failure. In April 2008, Furnace 2 at Plaintiff's New Haven plant ("Furnace No. 2"), which had first come on line but suffered mechanical difficulties in the previous year, experienced a transformer failure and became inoperable before it could produce saleable SiMn. In May 2008, Plaintiff commenced a claim with Defendants for more than $38,000,000 in losses sustained as a result of Furnace No. 2's failure between April 2008 and January 2009.[1] In May 2009, dissatisfied with the progress of its claim, Plaintiff brought this action, alleging breach of contract, bad faith under the West Virginia Unfair Trade Practices Act, and a *Hayseeds* claim. Extensive litigation followed, resulting the instant motion for partial summary judgment.

**A.     The Instant Motion**

Defendants' Motion asserts that Plaintiff has offered no proof of "actual loss" as required under the business interruption coverage in the policy, which limits recovery to the "actual loss sustained by the insured resulting directly" from "interruption of business." (Policy 41). The policy insures against the loss of "Gross Earnings less charges and expenses which do not necessarily continue during the interruption of business." (Policy 41). The policy also requires the insured to mitigate its business interruption losses "by making use of any stock." (Policy 30). Plaintiff's Proof of Loss (POL) sought over $38,000,000 in loss, based on projected average monthly lost earnings of $4,759,811.44 ($7,062,016 in lost sales less $2,302,204.58 in expenses each month, over a projected period of eight months). (Defs.' Ex. 574). Defendants argue that Plaintiff cannot

---

[1]Although a motion to amend the pleadings to assert losses from a shorter time period (March-October 2008) was granted on Sept. 16, 2011, this motion was ripe before the motion to amend was filed. Additionally, the amended pleadings do not affect the outcome of this motion.

demonstrate that it actually would have been able to sell the production expected from Furnace No. 2 and that it had inventory sufficient to prevent any loss of sales.

**B.      Standard of Review**

To obtain summary judgment, Defendants must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P.* 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). After extensive discovery, Plaintiff has failed to satisfy even this lenient standard. Plaintiff has not offered even a "scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252.

## II.
## Discussion

At first blush, Defendants' Motion seemed to be a quixotic attack against the obvious effects of losing the production of a new, additional furnace. Even if the proof of loss ("POL") exaggerated the loss amount, as Plaintiff has implicitly conceded, surely its evidence would be sufficient to create a genuine issue of material fact that Plaintiff suffered a recoverable loss. With a proven track record of sales from its other two furnaces, and an internationally-operating sales broker in Glencore, one would expect Plaintiff to easily demonstrate to a reasonable likelihood that it would have sold at least some of Furnace No. 2's expected production during the loss period. The Court assumed as much until it closely examined the evidence.

In support of their motion, Defendants filed a detailed, annotated Statement of Facts ("SOF," Doc. #559-Ex. A), a painstaking examination of the hundreds of documents and lengthy depositions the parties have assembled through discovery. The Court has waded through the relevant statements of facts and their supporting references to the discovery material. To be sure, the Court has also considered Plaintiff's response to Defendants' Statement of Facts (Doc. #533) in which Plaintiff has offered, statement-by-statement, its response.[2] Based upon the evidence before the Court, Plaintiff has not met its burden of offering sufficient evidence to survive Defendants' motion.

Plaintiff points to its expert testimony, its internal projections, and even a defense expert as its evidence of recoverable losses to counter Defendants' motion. First, Plaintiff's expert, Mr. Murlick, opines that Furnace No. 2 would have produced 132 metric tons (mt) per day during the loss period, at a cost of $18.2 million, and sold it for $48.7 million, representing a loss of $30.5 million. (Pl. Ex. 16A). His expert report includes schedules which support his estimates of Furnace No. 2's production capacity and the market price of SiMn during the loss period. What is missing is critical to this motion: he offers no opinion, nor even an explanation for the assumption, that Plaintiff would have sold any, much less all, of the expected production. Rather, he merely calculates the amount of saleable metal the furnace could have added, its market value, and the costs of production. Plaintiff must rely on other evidence to establish that it would have actually sold this production, or some portion of it. That evidence, as cited by Defendants and not refuted by Plaintiff, does not support Plaintiff's or its experts' assumptions.

---

[2] Plaintiff's "responses" are, by and large, unhelpful or worse. Plaintiff frequently denies a statement of fact and says the document or testimony speaks for itself, when the cited evidence amply supports Defendants' statement. Plaintiff rarely, if ever, points to a document, testimony, or anything else that challenges the fact stated. Responses such as these offer little substance to challenge Defendants' fact statements and undermine Plaintiff's and its counsels' credibility.

Turning to that evidence, the Court concludes that Plaintiff simply fails to put forth evidence to support its claims. Mindful that the evidence must be taken in the light most favorable to the Plaintiff, the Court reaches this conclusion somewhat surprised, but nonetheless certain, that the uncontroverted evidence produced through discovery and identified in the Statement of Facts obliterates Plaintiff's claim of actual loss.

### A. Plaintiff Fails to Identify Existing or Potential Sales Opportunities Damaged by the Loss Event

First, Plaintiff fails to identify a single existing sales contract or sales opportunity that was damaged by Furnace No. 2's failure to produce during the loss period. Plaintiff relied upon its agent, Glencore, to sell its production. Glencore had the exclusive rights to sell for Plaintiff,[3] so all of Plaintiff's sales during the loss period had to be made through Glencore. (Defs.' Ex. 101- Agency Agreement, ¶19; SOF 43, 44).[4] Furnace No. 2 was expected to double the production of SiMn, but breakdowns in 2007 and the transformer failure in 2008 prevented Plaintiff from producing any saleable SiMn from this furnace until after the loss period. The April 2008 breakdown occurred after the business interruption insurance was in effect. Plaintiff did not have any sales contracts for the new furnace before it failed. (SOF 60). As it considered its impending insurance claim, Plaintiff decided it needed a letter from Glencore to support its claim, so it obtained one from Mr. O'Connell, the Glencore sales agent who handled Plaintiff's business. (SOF 59). O'Connell's May 22, 2008 letter discussed possible sales from Furnace No. 2, mentioning customers Nucor and Gerdau and

---

[3] Privat also operated a sister company to Felman, "Felman Trading," which apparently conducted some sales efforts for Felman's product, but Felman's agreement with Glencore for the claim period was an exclusive contract valid through December 2009. (SOF 36).

[4] By its reference to a particular statement of fact, the Court, having examined the testimony or document cited, adopts and incorporates the source of evidence relied upon by Defendants. (Doc. #559-Ex. A).

emphasizing the need for Plaintiff to maintain inventory to guarantee deliveries. (SOF 68). But when he was deposed, O'Connell stated that Plaintiff had enough product for any sale Glencore could make in 2008 and that despite the breakdown of Furnace No. 2, Felman had growing inventory above its sales by June, 2008. (SOF 91). Then, in July, 2008, O'Connell prepared a spreadsheet for Plaintiff which showed sales lost because of its pricing, not its lost production from Furnace No. 2. (SOF 94-96). Likewise, Mr. Petrenko, Plaintiff's sales manager, testified that Plaintiff had enough stock from its two operating furnaces to meet all its sales demands every month during the loss period. (SOF 90).

Plaintiff's two largest customers in 2008 were companies Nucor and Gerdau, each of which operated several steel mills and expressed to Glencore their interest in long term contracts with Plaintiff in 2008. But their key representatives - Glencore's O'Connell, Nucor's Williams, and Gerdau's Dickerson - each testified that the loss of Furnace No. 2's production had no effect on their purchases from Plaintiff in 2008. Their agents testified that they would not have purchased any more SiMn from Plaintiff had it been able to produce more. (SOF 97, 100, 105). Likewise, Plaintiff's sister company, Felman Trading, which was created to act as an additional sales agent, could not identify any sales lost because Plaintiff had insufficient stock to meet customer requirements. (SOF 92).

To make matters worse for Plaintiff, its expert on sales pricing and the market for SiMn, Patrick Ryan, conceded that he had seen no evidence that the loss of Furnace No. 2 had caused any lost sale or inability to offer Plaintiff's production for sale. (SOF 95, 109). In fact, Plaintiff's own sales manager testified that in 2008, Plaintiff had enough stock "to supply current demands on every

given month" and that its inventory was increasing as production from the other furnaces exceeded sales. (SOF 90, 109, 123).

Given these facts, market conditions throughout the loss period make it difficult for Plaintiff to provide evidence to support its loss. With consistent, if not increasing, levels of inventory each month, Plaintiff is left with no identifiable actual loss. It cannot retrospectively identify a single instance when it failed to supply an actual order or lacked capacity to bid for a sale. *Compare Fidelity-Phoenix Fire Ins. Co. v. Benedict Coal Corp.*, 64 F 2d 347, 350 (4th Cir. 1933) (losses proved included "production that had been contracted for running through the period of suspension of operations.") Its exclusive agent, Glencore, affirmed Plaintiff's capacity was sufficient during 2008 to meet demand for actual purchases and lost sales were driven by price competition, not lost production. Plaintiff's primary customers likewise confirmed that Plaintiff had enough product to meet their requirements and that the loss of Furnace No. 2 had no bearing on any long-term agreements with Plaintiff. Indeed, Plaintiff's own experts do nothing more than assume Plaintiff would have sold more SiMn had Furnace No. 2 remained in operation. But neither expert provides any basis for that assumption, and an assumption does not constitute proof.

The court in *Fold Pak Corp. v. Liberty Mutual Fire Insurance Co.*, 784 F. Supp. 49 (W.D.N.Y. 1992) agreed that a plaintiff must demonstrate more than an assumption of lost sales to recover under a business interruption insurance policy. In *Fold Pak*, the plaintiff manufacturer claimed losses under a business interruption insurance policy on the theory that it could have produced more of its product, take-out food pails, but for the loss incident's damage to production facilities. However, the court gave summary judgment for the insurer because Fold Pak had made no showing that it could have actually sold any of the unproduced pails. *Id*. at 53-54. Fold Pak, like

Plaintiff, bought an insurance policy for actual losses in gross earnings, but attempted to claim reimbursement instead for the value of lost production. The *Fold Pak* court granted summary judgment because Fold Pak failed to show any actual decrease in gross earnings directly related to the loss event: "even if the plaintiff had produced the pails, nobody was standing in line to buy them." *Id* at 54.

Plaintiff argues that *Fold Pak* is inapplicable in this case because a number of purchasers would have been willing to buy the SiMn production lost through the failure of Furnace No. 2. (Pl. Mem. in Opp. 13, Doc. #529). However, Plaintiff has not supported this assertion by identifying a single actual lost sale, sale opportunity, or unmet customer demand that resulted from the failure of Furnace No. 2. In short, even if Plaintiff had produced more SiMn, Plaintiff has provided no evidence that anyone was standing in line to buy it.

**B.      Plaintiff Fails to Produce Evidence Showing that it Could Sell its Existing Inventory.**

Highlighting Plaintiff's inability to demonstrate lost sales is Plaintiff's failure to produce any evidence that it could sell even the SiMn it did produce.[5] Numerous documents created by Plaintiff during the 2008 period, preceding and covering the loss period, demonstrate Plaintiff's recurring inability to sell what it was producing before and after Furnace No. 2 failed. For instance, Plaintiff and Privat repeatedly pushed Glencore to sell more of its production and fretted over the size of its saleable inventory. (SOF 125, 127, 131, 135).[6] Plaintiff argues that the inventory was not saleable

---

[5]Although the policy required Plaintiff to mitigate its business interruption losses "by making use of any stock," (Policy 41) this provision is not determinative of the present motion because Plaintiff failed to prove any losses that it could have mitigated. However, Plaintiff's purchase of an insurance policy requiring it to sell material in stock further undercuts its argument that business practices required it to keep some indeterminate amount of stock on hand as buffer.

[6] Plaintiff's reported monthly stock on hand of crushed SiMn ranged from 3,451-6,357mt over the
(continued...)

material because Plaintiff "had to maintain buffer stock as part of its very nature as an SiMn manufacturer, and that decision remained within its discretion." (Pl. Mem. in Opp. 14, Doc. #529). However, Plaintiff provides no information about how much buffer was required nor any evidence that a specific customer or policy required it. Additionally, Plaintiff makes no attempt to reconcile its assertion that the excess stock was purposefully retained as buffer with the fact that its leadership was actively trying–and failing–to sell the supposed buffer stock. For example, on June 25, 2008, Plaintiff's CEO emailed executives at Privat, reporting that "I have been pressuring Glencore to do more in regard to moving our material . . . I must add that I too do not want inventory (money) sitting in stock, this is difficult to store and also makes it hard to pay the bills." (SOF 131). Also countering the "buffer" argument are Plaintiff's admissions that it was reaching its storage capacity for uncommitted product near the end of the claim period (Pl. Resp. to Defs. Statement of Undisputed Facts 34-35 Doc. #533), and considering a shutdown of SiMn production. (SOF 133).

Other courts have agreed that unsold inventory undercuts a manufacturer's loss claim. For example, in *Stone Container Corp. v. Arkwright Mutual Insurance Co.*, No. 93-6626, 1997 U.S. Dist. LEXIS 3978 (N.D. Ill. Mar. 25, 1997), a magistrate awarded summary judgment rejecting a business interruption claim where the insured manufacturer maintained excess stock during the interruption period and could show no specific lost sales. Plaintiff contends that *Stone Container* can be distinguished because unlike the plaintiff in *Stone Container*, Plaintiff did not have a large amount of stock on hand during the claim period. (Pl. Mem. in Opp. 12, Doc. #529). However, Plaintiff did have inventory of SiMn on hand during the loss period and provides no basis for differentiating its inventory from the stock on hand in *Stone Container*.

---

(...continued)
course of the claim period. (SOF 120).

Plaintiff's inventory and failed efforts to sell it also distinguish *Insurance Co. of North America, Inc. v. U.S. Gypsum Co.*, where the insured manufacturer could recover for the loss of one plant's production when it had "no warehouse stock" and all other plants were "performing at full capacity," 870 F. 2d 148, 154 (4th Cir. 1989), and *Rubbermaid v. Hartford Steam Boilers Inspection Co.,* where a jury was permitted to find an actual loss despite no evidence of specific lost sales. Among other reasons, that court concluded that "Rubbermaid was selling all of the product it could make and had customers waiting for the product." 645 N.E.2d 116, 118 (Ohio Ct. App. 1994). Also in contrast to Plaintiff's failed inventory sales effort is the loss proof put forward in *Northwestern States Portland Cement Co. v. Hartford Fire Insurance Co.*, 360 F. 2d 531 (8th Cir. 1966). In *Northwestern States*, the court amended the trial court's judgment, allowing a manufacturer plaintiff to recover as a business interruption loss the cost of replacing stock inventory that had sold in lieu of new production during a loss event. *Id*. at 534. Here, there is no evidence that the stock on hand during the loss event was depleted by new or ongoing customer demand.

**C.     Plaintiff Fails to Provide Alternate Means of Proving Actual Loss**

Plaintiff argues that the case law does not limit the practical means by which Plaintiff may prove its loss; that Plaintiff is "not required to show that it sought requests from customers to buy its SiMn, only to inform those customers that it did not have product to sell them, or that it made sales to customers and did not fill them." (Pl. Mem. in Opp. 10, Doc. #529) Plaintiff specifically contends that its status as a commodities manufacturer creates a unique circumstance in which losses should be evaluated by some other means. *Id*. However, whether Plaintiff should be permitted to show actual loss through some credible alternate means of proof is irrelevant because Plaintiff has not done so here. Plaintiff's attempts to advance alternate evidence of losses fail.

For example, Plaintiff argues that its pre-loss projections of net profit for 2008 are sufficient to prove an actual loss under the policy. (Pl. Mem. in Opp. 9, Doc. #529) ("The jury may consider and rely on Plaintiff's projections of its net income before the Transformer Failure.") Before the furnace breakdown, Plaintiff had forecast a net profit for 2008 in excess of $25 million. Its 2008 tax return, eventually filed in 2011, reported actual net profit of $9 million. However, Plaintiff failed to point to any witness or evidence that could tie the less-than-projected profit to the breakdown of Furnace No. 2. Apparently, Plaintiff expects the Court to surmise that Plaintiff could supply at trial the evidence it fails to adduce today. The Court declines to do so.

Desperately grasping for support, Plaintiff raises the report of one of the insurers' adjustors, Metal Strategies, Inc., which evaluated the POL shortly after it was submitted. That February 2009 report, relying upon the information Plaintiff had then provided, stated that only $17 million of the claim sought "is *potentially* owed" (emphasis added) and noted several important caveats. Among other matters, the report questioned how Plaintiff could hope to sell so much more SiMn, as the POL estimate would have Plaintiff more than doubling its market share. The report pointed out that a "realistic 'sellable'" portion of lost production should be addressed. Again, the report's assumptions are undermined by the evidence of what was really occurring with Plaintiff's sales and the marketplace.[7] By the third quarter of 2008, the market for Plaintiff's product declined dramatically, as a global recession hit steel producers. (SOF 134, 138, 140, 142). This decline persisted through the fourth quarter as well. (SOF 143, 144, 146). Now, as a result of Plaintiff's Amended Complaint, Plaintiff has eliminated the last three months of the loss period from its claim.

---

[7] Felman did not respond at argument to Defendants' Reply as to the inadmissibility of the report. The Court need not address this matter, as the report suffers the same flaw as Plaintiff's expert reports in that it assumes sales, and analyzes only production and prices.

Plaintiff agrees that losses in a business interruption insurance claim are "to be determined in a practical way, having regard to the experience of the business before the [interruption] and its probable experience thereafter." (Pl. Mem. in Opp. 7, Doc#529) (quoting *Cotton Bros. Baking Co. v. Industrial Risk Ins.*, 774 F. Supp. 1009, 1027 (W.D. La. 1989)). Plaintiff's experience as an SiMn manufacturer before Furnace No. 2's March 2008 failure was limited to production from two furnaces and provides no record of sales sufficient to demonstrate that added production would be sold. Plaintiff's experience after the failure was that of other manufacturers: in the words of its own CFO, "lack of demand due to global crisis." (SOF 163). Even if some proof of actual loss other than proof of specific lost sales or sales opportunities may be sufficient to prove "actual loss" for the purpose of the policy, there is no occasion to reach that question here, because Plaintiff has not offered any such proof.

### III.
### Conclusion

The extensive record developed in this case reveals that Plaintiff has not met its burden of producing even the minimal evidence of actual loss necessary to proceed with its claim. The Defendants' motion is therefore **GRANTED** and partial summary judgment is **ENTERED** for the Defendants on Plaintiff's claim for actual loss under the policy.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER: September 29, 2011

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE