IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

FELMAN PRODUCTION, INC.,
a Delaware corporation,

                Plaintiff,

v.                                             CIVIL  ACTION  NO.  3:09-0481

INDUSTRIAL RISK INSURERS,
an unincorporated association, et al.,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending is Defendants' Motion for Summary Judgment Based on Fraud, Misrepresentation, Breach of Conditions Precedent, or in the Alternative, for Partial Summary Judgment on Felman's Bad Faith Claims (Doc. # **561**).  As discussed below, the instant motion is **DENIED**.

**I.
Motion Based on Fraud and Misrepresentation**

Defendants, Industrial Risk Insurers ("IRI") and its member insurance agencies, argue that they are entitled to summary judgment because the evidence "unequivocally" establishes that Plaintiff Felman Production, Inc., ("Felman") made misrepresentations and omissions, and intentionally withheld material facts, during the adjustment period of Felman's claim with IRI.[1] Plaintiff's claim is therefore void because such misrepresentations void the Policy (Pl. Ex. 1, Policy IRI0002.003679-780, hereinafter "Policy") by its terms.

---

[1]The factual background to this motion is discussed more fully in this Court's September 29, 2011 Order on Defendant's Motion for Summary Judgment–No Actual Loss Sustained.

The Policy Felman purchased from Defendants is void by its terms if "whether before or after the loss, the insured has wilfully concealed or misrepresented any material fact or circumstance" concerning the loss claim, or "in case of any fraud or false swearing by the insured related thereto." (Policy 12). A fact is material if "a reasonable insurance company, in determining its course of action, would attach importance to the fact misrepresented." *See Long v. Ins. Co. Of N. Am.,* 670 F. 2d 930, 934 (10th Cir. 1982).

## A. Standard of Review

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P.* 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

**B.     Discussion**

Defendants focus on six communications by Felman during claim adjustment, alleging that in each instance Felman misrepresented critical facts and omitted material information. Addressing each of Defendants' six assertions in turn, the Court finds these matters are factual disputes reserved for the jury.

1.     *"Felman misrepresented the nature of its agreement with Glencore."*

First, Defendants point to Felman's descriptions of its relationship with Glencore, in which Felman refers to Glencore as a "purchaser" obligated to buy 150,000 metric tons (mt) of silicomanganese (SiMn) from Felman, rather than as Felman's "broker." Though Felman did, in fact, use the "purchaser" label, it provided a copy of its written agreement with Glencore to Defendants shortly after submitting its Proof of Loss. The agreement makes it clear that Glencore was Felman's exclusive *sales* agent and obligated to use its best efforts to *sell* 150,000 mt (plus or minus 15%). Whether identifying Glencore as a purchaser was an intentional misrepresentation, much less whether it was material, is a jury question.

2.     *"Felman withheld material information concerning its inability to sell its product."*

Next, Defendants claim that Felman withheld material information about its sales during the loss period. Clearly, there is evidence that Felman's key individuals were aware that some sales were being lost, that Glencore was not selling as much of Felman's product as Felman desired, and later that the market was weakening dramatically. Yet, it is equally clear that Felman supplied the Defendants and their adjusters voluminous then-current information about its sales, inventory, and customers. Additionally, the global economic crisis in the Fall of 2008 and its impact on the relevant marketplace were matters of public knowledge.

3. *"Felman misrepresented its inventory levels."*

Felman did provide contradictory data and explanations for the size of its inventory, but Felman also provided the adjusters and subsequently the Defendants in this suit with a number of documents reflecting the monthly inventory amounts throughout the claim period. Plaintiff's position on its inventory must be demonstrated to be willfully false or misleading to support summary judgment. Whether Felman's representations about its inventory were willfully false or misleading must be left to the jury. Of course, the amount and availability of inventory are material to the coverage, since the policy requires the insured to use its stock to mitigate. (Policy 41).

4. *"Felman made false statements regarding its customers."*

In its answers to Defendants' interrogatories, Felman listed the names of sixteen companies which, it stated, would have purchased from Furnace No. 2 had it not failed. Questioning Felman's CEO, Mr. Pragnell, at deposition, Defendants presented an October, 2008 spreadsheet (Defs.' Ex. 591) which listed all of Felman's customers from the second through fourth quarters of 2008. Mr. Pragnell agreed that many of the companies identified in the interrogatory response did not, in fact, purchase product from Felman at all during that period. Plaintiff provided no explanation for this inconsistency when it responded to this motion. Plaintiff did refer to a January 13, 2009 report that purportedly shows actual monthly sales data and customers, among other things. This report identifies Glencore and Felman Trading as the most frequent "buyers," so whomever the ultimate purchaser may have been, the Defendants were informed as to the actual sales amounts which went through Glencore or Felman Trading during the loss period. This evidence creates a dispute of fact as to whether Felman was willfully misrepresenting who its customers were, and whether the interrogatory answer meets the materiality test.

5. *"Contrary to its sworn claim, Felman had no control over its business."*

Defendants complain that Felman withheld the fact that Privat controlled Felman's business operations in order to avoid disclosing that Privat's managers and owners possessed important, discoverable information. Felman's poor handling of discovery requests and disclosures in this lawsuit may subject it to sanctions by the Court. However, whether its representations about Privat during claim adjustment were material to the insurance claim remains in dispute, both as to whether they constitute intentional misrepresentations and whether they were material to the claim.

6. *"Felman's claim of $38 million in business losses is overstated."*

Finally, Defendants wave Felman's Proof of Loss as the ultimate material misrepresentation, asserting that Felman knew, when the Proof of Loss was submitted, that it grossly overstated Felman's business interruption claim. There is plenty of evidence to challenge the Proof of Loss, much of which surfaced during the loss period and Defendants' investigation and adjustment of the claim. Nonetheless, Plaintiff has maintained the Proof of Loss, despite the downturn in the global market, throughout the loss period, the adjustment period, and even after it sued, until nearing the trial of this action. Only recently has Plaintiff acknowledged that a substantial portion of its claim is unsupported, and now Plaintiff has even amended its claim to eliminate the last three months of its claimed loss period. (Doc. #543).

Of course, there is also significant evidence that Felman knew its claim was overstated from the beginning. Plaintiff treats the Proof of Loss as an unabashed effort to maximize its claim, relying on a theoretically possible level of sales to justify payment. The Proof of Loss was premised on three factors, two of which are not seriously challenged. First, the production estimate for Furnace No. 2, while optimistic, was clearly just that–an estimate. Second, similarly, the Proof of

Loss included a price estimate that was reasonably supported. The third factor–how much Felman could reasonably expect to sell–was not a reasonable estimate, but that is a long way short of establishing that it was fraudulent, or an intentional misrepresentation, at the time it was made. Unlike the cases cited in Defendants' Memorandum in Support, *Mazzella* and *Mosrie*, where claims included completely false values and nonexistent items of loss, Felman's Proof of Loss is necessarily based on complex projections of loss. *See Mazzella v. Hanover Fire Ins. Co.*, 174 S.E. 521, 523 (W. Va. 1934) (claim for twice the purchase price of a recently-purchased piano voided policy); *Mosrie v. Automobile Ins. Co. of Hartford, Conn.*, 141 S.E. 871, 873 (W. Va. 1928) (claim for damage to a nonexistent Ford vehicle voided insurance policy). Determining whether the complex production estimates and market evaluations underlying the Proof of Loss were wilfully false is a job for the jury.

## II.
## Motion Based on Breach of Conditions Precedent

Defendants also move for summary judgment based on Plaintiff's alleged breach of the conditions precedent to any insurance coverage under the Policy, specifically, Plaintiff's duty to "cooperate with the Companies in all matters pertaining to loss or claims."[2] (Policy 65). Defendants are correct that cooperation clauses in insurance contracts are enforceable, and that a "refusal to

---

[2] The relevant portion of the Policy reads:

"Upon the Companies' request, the Insured shall submit to examination by the Companies, subscribe the same, under oath if required, and produce for the Companies' examination ell pertinent records, all at such reasonable times and places as the Companies shall designate, and shall cooperate with the Companies in all matters pertaining to loss or claims with respect thereto, including rendering at all possible assistance to effect collection of outstanding accounts receivable[.]" (Policy 65)

-6-

submit to an examination under oath or a refusal to produce documents" may constitute a failure to cooperate. *See* Defs.' Mot. 15 (quoting *Stover v. Aetna Cas.& Sur. Co.*, 658 F. Supp. 156, 159). However, as with Defendants' fraud and misrepresentation allegation, Plaintiff has produced sufficient evidence in response to Defendants' allegations of breach of condition precedent to create a material issue of disputed fact, reserved to the jury.

Specifically, Defendants allege three breaches of Plaintiff's duty to cooperate. First, they allege that Plaintiff fabricated information to support its loss claim, particularly the May 22, 2008 letter that Felman asked Glencore to create in support of its insurance claim. The parties do not dispute that the letter was created to give to Defendants in support of the insurance claim. However, the question remains of whether the letter was a willful effort to obfuscate claim adjustment, or a business estimate that turned out to be wrong. Second, Defendants allege that Plaintiff purposefully refused to produce relevant documents, particularly communications between Felman and Glencore.

Defendants point to a number of cases holding that failure to cooperate constitutes a breach of conditions precedent; these cases, however, are not an exact fit to the present circumstances. For example, in *Stover*, summary judgment was awarded for the defendant because the plaintiff outright refused to answer certain questions posed during deposition, even though the plaintiff did "cooperate to an extent." *Stover*, 658 F. Supp. at 160. *Stover*, however, was a case in which an individual plaintiff sought insurance money for fire damage; the defendant insurer asked for plaintiff's personal tax returns, work information, and employment history–which plaintiff completely refused to produce. *Id.* Defendants allege that Felman likewise refused to produce certain relevant financial information, but it is difficult to trace Defendants' argument to their desired conclusion because of the difference in size and scope of documentation between a business loss insurance claim by an

internationally-managed corporate alloys producer and an individual's claim for fire damage. For example, the *Stover* plaintiff failed to cooperate because he "made no response or gave vague, general answers about his financial status." *Id.* at 161. In contrast, Plaintiff has produced extensive business records, even if Defendants allege that they are ultimately unsatisfactory. Plaintiff has shown that it did produce some of the desired documents; whether the rest were withheld out of wilfulness or simply not produced because of Felman's size and structure is a question for the jury.

Third, Defendants allege that the Policy is void because Plaintiff refused to submit to examinations under oath ("EUOs") and prematurely terminated the adjustment process by filing the present lawsuit. Although presented as one argument, this is actually two separate arguments and will be addressed as such.

The Court first turns to Plaintiff's alleged failure to submit to the EUOs. As detailed in Defendants' Statement of Facts (Doc. #562 ¶¶166-67), Plaintiff did not flatly refuse to submit to EUOs. As can best be pieced together from the parties' submitted Statements of Fact, Defendants' allegation of stalling turns on the following events. On February 19, 2009, Defendant IRI issued a letter to Felman requesting production of 19 different reports or sources of information by March 6, 2009; the letter also requests EUOs with four Felman managers for the dates of March 18 and19, 2009. (Defs.' Ex. 376) Felman apparently did not produce the requested data by March 6, but did send at least some responsive data by March 10. (Defs.' Ex. 377) When IRI realized that the data would be later than March 6, it told Felman that the EUOs would have to be pushed back to a later date, as well. (Defs.' Ex. 377) The documents submitted do not reveal whether the 19 requested data points were the subject of repeat unfulfilled requests, nor do they tell the Court what happened after the March 10 partial data production. Whether IRI ever scheduled another proposed date for

the EUOs before the present suit was filed on May 1 is not addressed. Therefore, there is simply not a factual basis for the Court to conclude that Felman refused to submit to the EUOs. Although it is possible that a complete refusal to submit to EUOs may be a grounds for voiding a policy based on non-cooperation, there is no proof of such refusal before the Court today.

Second, the Court turns to Defendants' argument that Plaintiff's "premature" instigation of litigation voids the policy. Defendants quote *Aetna Casualty and Surety Co. v. Stover* for the proposition that "an insured cannot insulate itself against cooperate by commencing an action before there has in fact been repudiation of liability by the insurer." 658 F. Supp. 156, 161 (S.D.W. Va. 1987). However, as Plaintiff correctly notes, *Stover* is not good law on this point. As the West Virginia Supreme Court of Appeals wrote in *Thompson v. West Virginia Essential Property Insurance Ass'n*, "*Stover* suggests that so long as the insurer is investigating the loss or has not repudiated the policy, a suit cannot be brought . . . Contrary to *Stover* . . .our law does not require a repudiation of coverage before a suit may be filed on a [] policy." 411 S.E.2d 27, 32 (W. Va. 1991) *rev'd on other grounds*, *State ex rel. State Farm Fire & Cas. Co. v. Madden*, 451 S.E.2d 721 (W. Va. 1994) (internal citations omitted). The court continued, "[ . . . ]the provision in an insurance policy requiring the insured to submit to an examination under oath is not a condition precedent to filing a suit for the policy proceeds. However, an insured's refusal to comply with such a request may affect his right to recover under the policy." *Id*. at 33. As *Thompson* makes clear, a plaintiff's failure to cooperate may void a policy by its contractual terms, but there is no basis for the argument that filing suit is a failure to cooperate as a matter of law.

This is not the first time that Defendants have complained of Plaintiff's obstructive and uncooperative behavior during claim adjustment and litigation discovery, but whether Plaintiff's

behavior voids the policy is a question for the jury. *See* Defs. Mot. For Sanctions of Default Judgment and Dismissal of Felman's Claim (Doc. #451). Although Defendants may find fault with Plaintiff's responsiveness, Plaintiff can also point to ample information that was produced and numerous communications that were exchanged during adjustment. A question of fact is therefore created.

## III.
## Motion for Partial Summary Judgment on Plaintiff's Bad Faith Claims

**A.     Background & Applicable Law**

Defendants also seek partial summary judgment on Plaintiff's "bad faith" claims. In its Complaint, Plaintiff asserts claims for declaratory relief and breach of contract for the insurers' failure to pay for either the "physical loss and damage to covered property" or the "business interruption" losses. *See* Pl. Amended Complaint (Doc. #554). The Complaint then goes on to seek damages above the contractual claims for, *inter alia*, bad faith, violations of the state Unfair Trade Practices Act, and *Hayseeds* damages.[3] West Virginia Courts have recognized three distinct causes of action in the context of insureds suing their insurance companies. In *McCormick v. Allstate Insurance Co.,* 475 SE.2d 507 (W. Va. 1996), the West Virginia Supreme Court of Appeals discussed the interplay between an insured's contractual claims, *Hayseeds* claims, and violation of the State's unfair claim settlement practices, W. Va. Code § 33-11-4(9).

First, an insured may file a breach of contract claim to recover under the terms of the policy, as Plaintiff has done here in the first two counts of the complaint. Next, an insured who

---

[3]*Hayseeds* recognized that an insured who substantially prevails in an action to reover a property damage claim against his insurer is entitled to attorney fees and other compensatory damages, and, in some cases, punitive damages. Syl. Pt. 1, *Hayseeds, Inc. v. State Farm Fire & Cas. Ins. Co.*, 352 S.E.2d 73 (W. Va. 1986).

substantially prevails on a coverage claim may seek additional damages for aggravation, inconvenience, net economic loss, and attorney fees under *Hayseeds*, as Plaintiff has done in count five of its complaint. *McCormick*, 475 S E. 2d at 513-4. The insured does not need to prove bad faith on the part of the insurer to recover *Hayseeds* damages, but may do so in order to seek punitive damages. *Id*. at 514. The third type of claim, alleged in count four and explained in *Jenkins* v. *J.C. Penney Casualty Insurance Co.*, 280 S.E.2d 252 (W. Va. 1981), *rev'd on other grounds by State ex rel. State Farm Fire & Cas. v. Madden*, 451 S.E.2d 721 (W. Va. 1994) is based on violations of the unfair claim settlement provisions of the West Virginia Unfair Trade Practice Act (WVUTPA), W. Va. Code. § 33-11-4(9). This so-called "*Jenkins*" cause of action does not depend upon a successful contractual claim for coverage. *Maher v. Continental Cas. Co.*, 76 F.3d 535, 544 (4th Cir. 1996). Instead, a *Jenkins* plaintiff must show that the insurer violated one or more of the unfair claims settlement provisions and that such violations entail a general business practice on the insurers part, *McCormick*, 475 SE.2d at 514-15. Damages may include increased cost and expenses, including attorney fees, as well as punitive damages. *Id*. at 515. Proof of violations may come from "multiple violations . . . occurring in the same claim." *Id*. at 519.

Defendants argue for summary judgment on two grounds. First, that Plaintiff cannot prove that Defendants followed a "general business practice" of bad faith, as required for a *Jenkins* action; second, that Plaintiff cannot bring a *Hayseeds* claim because it cannot prove that it will substantially prevail, or, alternatively, that its losses would not be caused by Defendants' alleged bad faith claim adjustment. Addressing each argument in turn, the Court determines that Plaintiff has alleged sufficient facts to proceed with its claim.

**B.** **Analysis**

### 1.     *Jenkins* **Claim**

Defendants argue for summary judgment on the grounds that Plaintiff cannot prove that Defendants followed a "general business practice" of bad faith.  To prevail on its statutory *Jenkins* claims, Plaintiff must establish that the statutory "violations arise from separate, discrete acts or omissions in the claim settlement, and that they arise from a habit, custom, usage, or business policy of the insurer, so that, viewing the conduct as a whole, the finder of fact is able to conclude that the practice or practices are sufficiently pervasive or sufficiently sanctioned by the insurance company that the conduct can be considered a general business practice and can be distinguished by fair minds from an isolated event." Syl. Pt. 4, *Dodrill v. Nationwide Mut. Ins. Co.*, 491 S.E.2d 1 (W. Va. 1996).

In this case, Plaintiff has alleged violation of the state unfair claims settlement code (W. Va. Code § 33-11-4(9)), sections (b), (d), (e), (j), and (m),[4] and indicates that Defendants also failed to

---

[4]  The relevant portion of W. Va. Code § 33-11-4(9) is:

(9)*"Unfair claim settlement practices.*–No person shall commit or perform with such frequency as to indicate a general business practice any of the following[ . . .]

> (b) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;
>
> [ . . .]
>
> (d) Refusing to pay claims without conducting a reasonable investigation based upon all available information;
>
> (e) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;
>
> [ . . .]
>
> (j) Making claims payments to insureds or beneficiaries not accompanied by a statement setting forth the coverage under which payments are being made;
>
> [ . . .]
>
> (m) Failing to promptly settle claims, where liability has become reasonably clear, under one
> (continued...)

abide by state regulations specifying "Standards for Prompt Investigations and Fair and Equitable Settlements Applicable to all Insurers." W. Va. Code R. § 114-14-6.1 (providing for prompt investigation of claims) and § 114-14-6.7 (requiring an insurer to give notice if it expects a delay of more than 30 days in determining whether to accept a claim). Although it will be left to the finder of fact whether Defendants' alleged violations create a fair inference of an unfair business practice, Plaintiff has alleged sufficient statutory violations to survive this summary judgment motion. *See* Pl. Amended Complaint ¶¶ 67-68 (Doc. #554).

This is particularly true here because most of the alleged statutory violations involve the reasonableness of the insurer's conduct in response to the insurance claim. As noted in *American Safety Indemnity Co. v. Stollings Trucking Co., Inc.*, reasonableness determinations are "ordinarily questions of fact for the jury." No. 04-cv-0752, 2007 WL 2220589, at *6 (S.D.W. Va., Jul. 30, 2007) (quoting Syl. Pt. 5, *Hicks ex rel. Saus v. Jones*, 617 S.E.2d 457, 459 (W. Va. 2005)). Here, among other allegations, Plaintiff argues that Defendants have never decided the claims in the Proof of Loss by either paying all or part of it or expressly denying it. Further, Defendants' payment of $5.0 million was unallocated and made with a strong reservation of the insurers' rights to deny the Proof of Loss in total. Defendants have neither paid nor declined the property loss part of the claim, even though there seems little in dispute about it. The import of these facts amid the surrounding context of the insured-insurers interactions before the lawsuit must be left to the jury.

   **2.**     ***Hayseeds* Claim**

---

(...continued)
   portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage." W. Va. Code § 33-11-4(9) (West, Westlaw through 2011 Reg. Sess.)

Next, Defendants move for summary judgment on Plaintiff's *Hayseeds* claim.[5] A *Hayseeds* claim is available "[w]henever a policyholder substantially prevails in a property damage suit against its insurer." In a *Hayseeds* action, "the insurer is liable for: (1) the insured's reasonable attorneys' fees in vindicating its claim; (2) the insured's damages for net economic loss caused by the delay in settlement, and damages for aggravation and inconvenience." Syl. Pt. 1, *Hayseeds, Inc. v. State Farm Fire & Cas.*, 352 S.E.2d 73, 80 (W. Va. 1986). *Hayseeds* also allows for punitive damages. *Id.* Additionally, "[t]o recover attorney fees and net economic loss damages and damages for aggravation and inconvenience under syllabus point 1 of *Hayseeds,* it is not necessary that a plaintiff show bad faith." *McCormick v. Allstate Ins. Co.*, 475 S.E.2d 507 (W. Va. 1996) (internal citations omitted).

Defendants argue that Plaintiff has not shown any evidence that it will "substantially prevail" in litigation, nor that it actually suffered damages that would be covered under *Hayseeds*. *Cf. Tastee Treats v. United States Fidelity and Guaranty Co.*, No. 07-cv-00338, 2011 U.S. Dist. LEXIS 61499 at *16-17 (S.D.W. Va., Jun. 7, 2011) ("there is no evidence in the record to establish aggravation and inconvenience damages."). However, this argument fails because Plaintiff's ability to

---

[5]*Hayseeds* itself was a property damage case. The Court does not here decide whether *Hayseeds* would apply in a business interruption claim, because it is clear that *Hayseeds* would apply to at least Plaintiff's claim for property damage to the furnace, and the claim is therefore appropriate. However, it does appear that West Virginia has extended the availability of *Hayseeds* damages to all first-party insurance contracts. *See Marshall v. Saseen*:

"Although we recognize that Hayseeds and its progeny involved insurance policies covering property damage claims, we can see no reason why these principles should not apply to uninsured and underinsured motorist coverage. . . .The critical point is that this property damage coverage, as well as the uninsured and underinsured motorist coverage, constitutes first party insurance. First party insurance means that the insurance carrier has directly contracted with the insured to provide coverage and to reimburse the insured for his or her damages up to the policy limits." 450 S.E.2d 791, 797 (W. Va. 1994).

substantially prevail and claim *Hayseeds* damages cannot be decided until the measure–if any–of Plaintiff's success in other parts of this action is determined. The requirement to proceed with a *Hayseeds* claim at this point in the case is minimal; eventually, Plaintiff will have to "substantially prevail," in the claim, then demonstrate its damages. The Defendants' motion on this count fails.

### 3. Defendants' Damages Argument

Underlying Defendants' argument on both the *Jenkins* and *Hayseeds* claims is the idea that Plaintiff cannot prevail because Plaintiff cannot prove that Defendants' claim adjustment process– bad faith or no–actually caused any injury to Plaintiff. As to the *Hayseeds* claim, which Defendants address only perfunctorily, *Hayseeds* provides for a broad array of remedies: attorneys fees, punitive damages, compensatory damages, and damages for aggravation. The fact of this litigation, with its obvious potential for attorney fee recovery in the event Plaintiff prevails under *Hayseeds*, alone denies Defendants' argument. Although Plaintiff will have to "substantially prevail" on its underlying property insurance claim in order to proceed with its *Hayseeds* claim, it need not allege damages separate from its insurance claim to survive summary judgment.

As to the statutory claim, Plaintiff has alleged sufficient damage to survive summary judgment. Defendants argue that the alleged statutory violations are "regulatory issues" and there is no evidence that they have caused Plaintiff to suffer any damages. *See* Defs.' Reply 19 (Doc. # 538). However, this mischaracterizes the alleged violations, which include substantive violations, of, for example, W. Va. Code § 33-11-4(9)(e), "Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed." Plaintiff alleges that Defendants owe but have not paid millions of dollars in business losses, as well as the cost of repair

-15-

for an expensive industrial furnace.[6] Plaintiff has also engaged in three years of litigation. It is no stretch to imagine that a three-year delay in payment and the cost of extensive litigation constitute injury to Plaintiff. The relation of such an injury to the alleged statutory violation is strong enough to avoid summary judgment.

As another example, one of the statutory violations alleged is Defendants' failure to "promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage." W. Va. Code § 33-11-4(9)(m). In this case, Defendants do not appear to substantially dispute that the property damages to Furnace No. 2 would be covered by the Policy, yet have refused to pay an amount specifically targeted toward replacing the furnace for three years, a facial violation of the Act. Plaintiff also alleges that Defendants violated W. Va. Code § 33-11-4(9)(j) by paying a Plaintiff blanket sum ($5 million dollars with a reservations of rights) yet failing to indicate what the payment covers. Defendants decry Plaintiff's complaint about the non-classification of the payment because it, "incredibly, involves IRI *paying millions of dollars to Felman*." Defs.' Reply 18 (Doc. #538) (emphasis in original). However, this complaint is self-defeating: in making this assertion, Defendants are using the payment's vague designation to their advantage in litigation. Conceivably, Defendants could assert that the payment was for something else entirely. Use of a facial statutory violation to bolster an argument in litigation undermines

---

[6]Although this Court's September 29 order on Defendant's "No Actual Loss" motion removes Plaintiff's claim for business losses, a *Jenkins* action does not actually require the Plaintiff to succeed on the merits, and so Plaintiff's claim for business losses *and* Plaintiff's still-live claim for the damage to Furnace No. 2 can be considered in the *Jenkins* analysis.

-16-

Defendants' argument that the violation does not injure Plaintiff. It is clear that Plaintiff has alleged sufficient injury as a result of Defendants' alleged violations to proceed with this claim.

C.  **Plaintiff's Property Damage Claim**

In this case, Plaintiff seeks to recover both property damage and business interruption losses from its insurers. While the business interruption loss claim has been resolved against Plaintiff by the Court's ruling on the Defendants' "Actual Loss" motion, the property damage claim stands. Thus, if Plaintiff substantially prevails on its property damage contractual claim, it may be awarded *Hayseeds* damages. Even though Plaintiff's business interruption claim has been denied, Plaintiff may still seek *Jenkins* damages for violations of the unfair settlement practices act, as to the handling of both the property damage and business interruption claims. Further, the Court is persuaded that Plaintiff has sufficient evidence to pursue its bad faith, *Hayseeds*, and *Jenkins* claims. Defendants' alternate motion for partial summary judgment is **DENIED**.

## IV.
## CONCLUSION

For the reasons articulated in this opinion, the Court finds that Defendants' Motion for Summary Judgment fails on all counts and is **DENIED**. The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER: September 29, 2011

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE